**FARMERS GRAIN MARKETING TERMINAL (AAL), an Incorporated Association, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. GC 75–121–K.**

United States District Court,
N. D. Mississippi,
Greenville Division.

June 20, 1977.

J. Kearney Dossett, Jackson, Miss., for plaintiff.

Jack D. Warren, Dept. of Justice, Washington, D. C., H. M. Ray, U. S. Atty., Oxford, Miss., for defendant.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In this tax refund suit based upon 28 U.S.C. § 1346(a), plaintiff, Farmers Grain Marketing Terminal (AAL), a Mississippi corporation with its principal place of business at Greenville, sues the United States for recovery of income tax deficiencies assessed by the Commissioner of Internal Revenue for the years 1971 and 1972, which were paid under protest.

The record before the court is presented upon stipulated facts, the parties disagreeing only as to the law applicable thereto.

### I.

Plaintiff, organized as an agricultural association under Mississippi law, Miss.Code Ann. § 79–17–1, et seq. (1972), was incorporated on March 5, 1968, and began conducting a grain elevator and storage business during its fiscal year ended July 31, 1969. On September 5, 1969, plaintiff requested to be exempt under 26 U.S.C. § 521, which provides exemption from taxation for farmers' cooperative organizations except as otherwise provided in Part I of Subchapter T (26 U.S.C. § 1381, et seq.). Four days later, the Internal Revenue Service (IRS) approved plaintiff's exemption application, thus making plaintiff subject to income taxation in accordance with 26 U.S.C. § 1381, et seq.[1] Unquestionably during the time relevant to this action, plaintiff retained its status as a farmers' cooperative taxable under 26 U.S.C. § 1381, et seq.

In its initial return for the fiscal year ended July 31, 1969, plaintiff properly elected, pursuant to 26 U.S.C. § 248, to amortize organizational expenditures for the minimum period of 60 months (5 years) permitted by statute. The amount claimed in its election statement, however, was only the $267.75 of such expenses which had been billed during plaintiff's initial fiscal year. This amount yielded an amortized organizational expense deduction of $53.55 for five successive fiscal years, including the election year. During its first fiscal year, plaintiff, however, incurred additional organizational expense of $2,207.25, which amount was unbilled to plaintiff by the end of its initial fiscal year and therefore was omitted from the election statement. This omitted sum would, if allowed, provide an additional amortized organizational expense deduction of $441.25 for each of the fiscal years 1971–73.[2] The IRS, upon audit, disallowed amortized deductions in any amount in excess of that established in plaintiff's election statement as originally filed.

---

1. The requirements which such an association must meet and maintain to receive and retain a § 521 exemption as a farmers' cooperative are succinctly described in the IRS letter approving plaintiff's application:

   (1) substantially all of the voting stock or memberships must be held by producers who are marketing their products or purchasing their supplies and equipment through the association; (2) products must not be marketed for nonmembers in an amount the value of which exceeds the value of products marketed for members; (3) supplies and equipment must not be purchased for nonmembers in an amount the value of which exceeds the value of purchases of supplies and equipment for members; (4) supplies and equipment must not be purchased for persons who are neither members nor producers in an amount the value of which exceeds 15 percent of the value of all purchases; and (5) the net proceeds from the business must be allocated and/or apportioned to all patrons, including members, nonmembers and nonproducers, on a patronage basis.

2. Plaintiff concedes that the amount it could have claimed during 1969 and 1970, the first 2 years of the five-year amortization period, has been lost.

For its first tax year, plaintiff reported a net operating loss of $79.31. For its second tax year, plaintiff had gross income of $240,248.89, with deductions totaling $287,-770.41; consequently, no income taxes were due for that year. During its second fiscal year, plaintiff, however, placed into service admittedly new depreciable tangible personal property used in its business, and known as "new section 38 property", as defined in 26 U.S.C. § 48,[3] which property cost $886,060 and had a useful life of 8 years or more.

For its 1971 fiscal year, plaintiff had gross income of $404,800 and claimed deductions totaling $399,146, including an amortization deduction of $936.45 for organizational expenses, disallowed on audit, and net operating loss deductions carried over from 1969 and 1970, totaling $79.31 and $47,442.21 respectively. Thus, plaintiff's reported taxable income was $5,654 which yielded an income tax liability of $1,244. Plaintiff, however, claimed an investment credit carryover of $62,024 from fiscal year 1970 based upon its having placed into service new section 38 property during that earlier fiscal year. This claimed investment

credit was used by plaintiff in its 1971 tax return to offset its $1,244 tax liability, leaving, according to plaintiff's theory, a $60,-780 investment credit carryover available for similar use in succeeding years.

For its 1972 tax year, plaintiff's gross income was $475,075, to which deductions in the total amount of $412,444, including a subsequently disallowed amortization deduction of $936.45, were applied. Thus, for 1972, plaintiff reported a taxable income of $62,631 which yielded a tax liability of $23,-563. In its 1972 return, plaintiff offset its tax liability by the use of claimed investment credit which included a credit of $1,409 from fiscal 1972, the appropriateness of which the IRS concedes in the present action, as well as the subsequently disallowed investment credit carryover from the previous year of $60,780.

It is established that plaintiff paid no patronage dividends[4] to its patrons or other dividends on its capital stock for either of the fiscal years in issue. Indeed, no deductions were claimed or allowed for such fiscal years for income distributed in accordance with 26 U.S.C. § 1382(b), (c),[5] or

---

3. Investment credit in certain depreciable property was made available by the Revenue Act of 1962, Pub.L. 87–834, 76 Stat. 960, which added to the Internal Revenue Code § 38, the general investment credit provision, as well as §§ 46–48 which prescribe rules governing implementation of the general credit provision.

4. Section 1388 of Title 26 provides
   (a) Patronage dividend.—For purposes of this subchapter the term "patronage dividend" [with certain specific limitations] means an amount paid to a patron by [a farmers' cooperative]—
   (1) on the basis of quantity or value of business done with or for such patron,
   (2) under an obligation of such organization to pay such amount, which obligation existed before the organization received the amount so paid, and
   (3) which is determined by reference to the net earnings of the organization from business done with or for its patrons. . . .

5. Section 1382. Taxable income of cooperatives, provides
   (a) Gross income.—Except as provided in subsection (b), the gross income of any organization to which this part applies shall be determined without any adjustment (as a reduction in gross receipts, an increase in cost of goods

sold, or otherwise) by reason of any allocation or distribution to a patron out of the net earnings of such organization or by reason of any amount paid to a patron as a per-unit retain allocation (as defined in section 1388(f).
   (b) Patronage dividends and per-unit retain allocations.—In determining the taxable income of an organization to which this part applies, there shall not be taken into account amounts paid during the payment period for the taxable year—
   (1) as patronage dividends (as defined in section 1388(a) ), to the extent paid in money, qualified written notices of allocation (as defined in section 1388(c), or other property (except nonqualified written notices of allocation (as defined in section 1388(d) ) ) with respect to patronage occurring during such taxable year;
   For purposes of this title, any amount not taken into account under the preceding sentence shall, in the case of an amount described in paragraph (1) or (2), be treated in the same manner as an item of gross income and as a deduction therefrom, and in the case of an amount described in paragraph (3) or (4), be treated as a deduction in arriving at gross income.
   (c) Deduction for nonpatronage distributions, etc.—In determining the taxable income of an

amounts, the tax treatment of which would have been determined without regard to 26 U.S.C. § 1381, et seq., within the purview of § 46(d)(2)(C). It is readily apparent that Article V of plaintiff's Articles of Incorporation, providing for the allocation of its entire net margins during each accounting period on a patronage basis to its patrons, supplies the perspective from which deductibility of patronage dividends as defined in § 1388 would have been available to plaintiff had they been paid.

The IRS audit, in addition to eliminating amortized organizational expense deductions in excess of the $53.55 claimed in plaintiff's election statement, determined that "no investment credit from the year ending [July 31, 1970] is allowable in  .  . [1971] and [1972]," *citing* Revenue Ruling 70–328, 1970–1 C.B. 5 and *Helena Cotton Oil Co., Inc. v. C. I. R.,* 60 T.C. 125 (1973). Thus, tax deficiencies were assessed against plaintiff in the following amounts: $1,636.86 for 1971 and $24,161.77 for 1972. Plaintiff paid these assessments on or about July 12, 1974, and on October 16, 1974, plaintiff timely filed its claim for refund for the assessed deficiencies.[6] On September 25, 1975, plaintiff filed this action seeking refund of the deficiencies in issue.

## II.

We are called upon to determine whether the IRS was correct in denying the additional amount claimed by plaintiff as amortized organizational expense deductions for 1971 and 1972 as well as the validity of its elimination of plaintiff's investment credit carryover from 1970. There are two dis-

tinct legal issues which arise from the uncontradicted facts: (1) Whether a corporation, that in its initial tax return elected to amortize organizational expenses over a five-year period, may in a subsequent year, but within the five-year period, properly deduct as an organizational expense an amortized amount which would have then been proper, but for the fact that the total additional organizational expense, though incurred, was not billed to the taxpayer during its initial tax year and was therefore inadvertently omitted from the taxpayer's amortization election statement; (2) whether a farmers' cooperative within the meaning of 26 U.S.C. § 521 which places property otherwise entitling such entity to an investment credit into service in a year in which it pays no rebates or dividends and sustains a net operating loss is entitled to such investment credit.

### A.

We first consider the validity of plaintiff's claim to the additional organizational expense deduction. Resolution of this issue necessarily involves consideration of 26 U.S.C. § 248 and regulations prescribed thereunder. Relevant portions of § 248 provide:

(a) Election to Amortize.—The organizational expenditures of a corporation may, at the election of the corporation (made in accordance with regulations prescribed by the Secretary), be treated as deferred expenses. In computing taxable income, such deferred expenses shall be allowed as a deduction ratably over such period of not less than 60 months
.   .   .   .
.        .        .        .        .

organization described in section 1381(a)(1), there shall be allowed as a deduction (in addition to other deductions allowable under this chapter)—
(1) amounts paid during the taxable year as dividends on its capital stock; and
(2) amounts paid during the payment period for the taxable year—
(A) in money, qualified written notice of allocation, or other property (except nonqualified written notices of allocation) on a patronage basis to patrons with respect to its earnings during such taxable year which are derived from business done for the United

States or any of its agencies or from sources other than patronage, or
(B) in money or other property (except written notices of allocation) in redemption of a nonqualified written notice of allocation which was paid, during the payment period for the taxable year during which the earnings were derived, on a patronage basis to a patron with respect to earnings derived from business or sources described in subparagraph (A).

**6.** No notice of disallowance was ever given by the IRS, see 26 U.S.C. § 6532.

(c) Time For and Scope of Election.— The election provided by subsection (a) may be made for any taxable year beginning after December 31, 1953, but only if made not later than the time prescribed by law for filing the return for such taxable year. . . . The period so elected shall be adhered to in computing the taxable income of the corporation for the taxable year for which the election is made and all subsequent tax years.[7]

Thus, it is clear that the election to amortize can be made only once and then not later than the time allowed for the filing of the corporation's initial tax return, and that the amortization period elected is binding upon the taxpayer. The critical issue, however, is whether the word "election" in § 248 contemplates the exact amount of organizational expenditures which are amortized as deferred expenses in the election statement. If so, it is clear that no alteration in the amount claimed in a corporate taxpayer's election statement can be made subsequent to the expiration of the time allowed for filing of its initial return. 26 U.S.C. § 248(c). See *J. E. Riley Invest. Co. v. C. I. R.*, 311 U.S. 55, 61 S.Ct. 95, 85 L.Ed. 36 (1940).

The IRS relies primarily upon Regulation 1.248–1(c) which provides in relevant part:

> The [election] statement shall set forth the *description and amount* of the expenditures involved, the date such expenditures were incurred, the month in which the corporation began business, and the number of months . . . over which such expenditures are to be deducted ratably. (Emphasis added).

From the wording of this regulation, defendant would infer that an erroneous entry as to the amount of organizational expenditures involved is absolutely binding upon the taxpayer. The taxpayer responds by contending that Regulation 1.248–1(a)(2) provides that "[i]f a corporation exercises the election provided in section 248(a), such election shall apply to *all* of its expenditures which are organizational expenditures with-

in the meaning of § 248(b) [; and that the additional amounts in question concededly fall within § 248(b)]." (Emphasis added). Defendant emphasizes, however, that § 248(a) requires the election to amortize organizational expenditures to be "made in accordance with regulations prescribed by the Secretary or his delegate." Defendant argues that this phrase combines with the terms of Regulation 1.248–1(c), supra, to preclude plaintiff's claim. While defendant's position would appear to be more cogent where a taxpayer has failed to comply with the stated regulation by completely omitting any organizational expenditures from the election statement, and subsequent to expiration of the time allowed, attempts to rectify such failure, that is not the situation here presented. When reduced to its essence, such a belated attempt would involve no more than an attempt to elect amortization after the statutory period allowed for that purpose has expired.

Here, defendant does not argue that plaintiff's election statement failed to comply with the applicable regulations, see, e. g., Reg. 1.248–1(c), but asserts that the amount which can be deducted under § 248(a) is restricted to the original, although erroneously low, amount claimed in the taxpayer's election statement. Significantly, even though § 248(c) makes the amortization period selected by the taxpayer binding upon the taxpayer, it is silent concerning the right to alter or amend the amount to conform to the facts. We are not persuaded that statutory silence in this respect may, by fair implication, be the basis for invalidating a correcting amendment or alteration. Conversely, we believe § 248(a), when juxtaposed with the time limitations of § 248(c), manifests a legislative intent to obligate a corporate taxpayer to adhere to the *method* of tax computation that it selects by filing the election statement.

Defendant relies heavily on the United States Supreme Court decision in *Riley*, supra, which held that a corporation could

---

7. Subsection (b) of § 248, defining organizational expenses, is omitted, since admittedly

the additional amount claimed by plaintiff is clearly within the purview of that subsection.

not, by amendment, avail itself of the percentage depletion allowance when no election for that purpose was made before expiration of the time for the taxpayer's first return. The *Riley* Court's holding, though on facts not analogous, is based upon a distinguishing rationale especially applicable here:

> We are not dealing with an amendment designed merely to correct errors and miscalculations in the original return. Admittedly the Treasury has been liberal in accepting such amended returns even though filed after the period for filing original returns. This, however, is not a case where a taxpayer is merely demanding a correct computation of his tax for a prior year based on facts as they then existed. Petitioner is seeking by this amendment not only to change the basis upon which its taxable income was computed . . . but to adopt a new method for computation for all subsequent years.

311 U.S. at 58, 61 S.Ct. at 97, 85 L.Ed. at 39. The factual distinction drawn in *Riley* is here presented with remarkable clarity: The election to amortize organizational expenses had been made in accordance with applicable regulations; the corporate taxpayer now seeks only to correct an error in the original election statement. We hold upon the authority of *Riley* that plaintiff may do so and the IRS incorrectly denied the additional amortized organizational expenditure deduction of $441.25 per year for 1971 and 1972.

### B.

■ We next turn to the paramount controversy between the parties: whether a farmers' cooperative may obtain an investment credit when property otherwise entitled to such treatment is placed into service in a year when the cooperative incurs a net operating loss and no deductible rebate payments to its patrons or members are made.

In arguing the affirmative, plaintiff stands in direct opposition to the position taken by the IRS in Rev.Rul. 70–328 CB 1970–1, p. 5, subsequently adopted by the Tax Court in *Helena Cotton Oil Co., Inc. v. C. I. R.,* 60 T. C. 125 (1973), and followed in *Farmer's Union Marketing & Proc. Ass'n. v. United States,* 77–1 USTC ¶ 9213 (D.Minn., Feb. 1, 1977). Resolution of this important issue necessitates close analysis of these opinions,[8] within the framework of the interrelated aspects of Congressional accommodation of taxability of farmers' cooperatives and the availability of investment credit to such organizations.

By qualifying as a § 521 farmers' cooperative, plaintiff was taxable for the years in issue under 26 U.S.C. § 1381 et seq. which, rather than exempting such a cooperative from taxation, provides special tax deductions for patronage dividends and per unit retain allocations as well as certain nonpatronage distributions. 26 U.S.C. § 1382. Technically, farmers' cooperatives are subject to both the normal tax and surtax, 26 U.S.C. § 11, and the alternative capital gains tax, § 1201, on corporations generally, and though *not* tax exempt organizations, they do receive a deduction for dividends and distributions made pursuant to § 1382, which deduction is not available to ordinary business corporations. All else being equal, § 521 cooperatives would, to the extent of their § 1382 deductions, have a comparative tax advantage over ordinary corporations. Both parties recognize, however, that Congress has seen fit to reduce this apparent advantage by making the amount of investment credit available for carryback or carryover by a farmers' cooperative a function of the benefit such organization receives from its special tax status under § 1381 et seq.

Besides extensively revising the tax treatment of cooperatives, the Revenue Act of 1962 added the investment credit provi-

---

**8.** Defendant also cites 5 Mertens, Law of Federal Income Taxation, § 32A.27 (1975) and 192 2nd Tax Management, Investment; Suspension; Termination VII, D, as authority for its position concerning the unavailability of the tax credit. These secondary authorities merely rely upon and restate the opinions of the IRS and Tax Court noted in the text; thus analysis thereof would add nothing to the substance of this opinion.

sion to the Internal Revenue Code. 26 U.S.C. § 38 provides in relevant part: "There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part." As previously noted § 1381 makes § 521 farmers' cooperatives subject to the taxes imposed on corporations generally under §§ 11 and 1201. Thus within statutory limitations, such a cooperative may avail itself of the general investment credit provision to the extent that taxes are imposed upon it by either § 11 or § 1201.

Statutory limitations upon the availability of the investment credit and procedures for determining the proper amount which can be used to offset tax liability for a given year are found in 26 U.S.C. §§ 46–48. Under § 46(a) the credit allowed may not exceed a $25,000 tax liability for the tax year in which the credit is used, plus an additional percentage specified in terms of the date in which the tax year ends. It is clear that the amount of plaintiff's tax liability was less than $25,000 for each year in issue. Section 46(a) also limits the amount of available investment credit to 7% of the qualified investment. It is undisputed that plaintiff placed new section 38 property costing $886,060 with a useful life of 7 or more years[9] into service in 1970. Therefore, the amount of plaintiff's qualified investment under § 46(c)(1) and (2), unless otherwise limited, is equal to 100% of the cost basis of the new section 38 property placed into service during that year, i. e., $886,060. Thus, the amount of credit which plaintiff claims under § 46(a)(1) is (.07 × $886,060) $62,024. The defendant does not challenge the accuracy of this mathematical computation. To be entitled to such amount as an investment credit, plaintiff must demonstrate that § 46(d) does not, as the defendant contends, eliminate an otherwise available investment credit because

the plaintiff cooperative placed new section 38 property into service in a loss year.

Section 46(d) restricts the availability of investment credit, in relevant part:

(1) In general.—In the case of—

. . . . .

(C) a cooperative organization described in section 1381(a), the qualified investment and the $25,000 amount specified under subparagraphs (A) and (B) of subsection (a)(2) shall equal such person's ratable share of such items.
(2) Ratable share.—For purposes of paragraph (1), the ratable share of any person for any taxable year shall be—

. . . . .

(C) in the case of a cooperative association, the ratio (i) the numerator of which is its taxable income and (ii) the denominator of which is its taxable income increased by amounts to which section 1382(b) or (c) applies and similar amounts the tax treatment of which is determined without regard to [§ 1381 et seq.].

Congress has therefore provided § 521 farmers' cooperatives a specific formula for computing such cooperatives' ratable share of section 38 investment credit. Ratable share is statutorily defined as the product of the following equation:

$$\frac{\text{Taxable Income}}{\text{Taxable Income + deductions}} \times \text{qualified investment}$$

made available by status as a cooperative. Since it is admitted that plaintiff claimed no deductions which would increase the denominator of the fraction in the ratable share formula, that formula as applied to plaintiff is $\frac{\text{Taxable Income}}{\text{Taxable Income}} \times$ qualified investment. It is at this precise point that a sharp divergence in statutory

---

**9.** Under § 48(a), to the extent relevant here, section 38 property means:

  (A) tangible personal property

. . . . .

Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life . . . of 3 years or more.

New section 38 property is such property which is placed into service after December 31, 1961 "if the original use of such property commences with taxpayer and commences after such date." Id. § 48(b)(2).

interpretation results from the contentions of the parties.

The defendant asserts that since plaintiff admittedly had no income upon which income tax was computed for 1970, the year in which its new section 38 property was placed into service, its taxable income for purposes of 46(d)(2) (ratable share) is zero. Therefore, in defendant's view, zero divided by zero cannot produce a meaningful number by which qualified investment may be multiplied. Defendant thus concludes that plaintiff's ratable share of qualified investment is zero and that plaintiff has no investment credit which it can carry forward or carry back from 1970. Plaintiff, on the other hand, maintains that Congress articulated the ratable share formula in order to limit investment credit available to farmers' cooperatives in the same ratio that its taxable income is reduced by the special deductions not available to ordinary corporations, i. e., when a cooperative's taxable income is not so reduced, it may take full advantage of investment credit, and the fact that the property giving rise to such credit is placed in to service in a year in which the cooperative suffers a net operating loss is irrelevant. We are of the opinion that plaintiff's interpretation is the correct one. Nevertheless, we also believe that the issue, the

answer to which is crucial to the validity of plaintiff's interpretation, is whether "taxable income" in the § 46(d)(2) formula can be a negative figure.[10] Having so concluded, we are constrained to disagree with certain authority which we, with deference, believe to have based their holdings upon a misreading of § 46(d)(2)(C). Our disagreement requires a measure of detail to support the rationale of our holding, particularly since our research reveals no federal court has reached a similar conclusion.

The genesis of the contrary view may be found in Revenue Ruling 70–328, which was based upon facts identical, in material respects, to those in the case sub judice.[11] Basic to the IRS's conclusion that a cooperative cannot have investment credit when section 38 property is placed into service in a loss year is its opinion that

[i]f a cooperative has no taxable income, a zero as the numerator of the . . . ratio automatically yields a zero ratable share of the qualified investment and a zero ratable share of the $25,000 amount specified in § 46(a)(2) . . . .. The determination of an unused investment credit for carryback and carryover purposes under section 46(b) . . .[12] is

(A) an investment credit carryback to each of the 3 taxable years preceding the unused credit year, and
(B) an investment credit carryover to each of the 7 taxable years following the unused credit year,
and shall be added to the amount allowable as a credit by section 38 for such years, except that such excess may be a carryback only to a taxable year ending after December 31, 1961. The entire amount of the unused credit for an unused credit year shall be carried to the earliest of the 10 taxable years to which (by reason of subparagraphs (A) and (B) such credit may be carried, and then to each of the other 9 taxable years to the extent that, because of the limitations contained in paragraph (2), such unused credit may not be added for a prior taxable year to which such unused credit may be carried. In the case of an unused credit for an unused credit year ending before January 1, 1971, which is an investment credit carryover to a taxable year beginning after December 31,

---

10. Plaintiff's argument that the validity of its position does not turn upon whether § 46(d)(2) taxable income may be a negative figure, ignores the detailed computational steps Congress provided for determining whether, and the extent to which, a cooperative is entitled to an investment credit. To do so would be, we believe, clearly improper.

11. The material facts described in the Revenue Ruling were thus summarized:
During 1968 the cooperative acquired and put into service section 38 property. During that taxable year its operations resulted in a net operating loss. . . .

12. Section 46(b) provides in relevant part:
(b) Carryback and Carryover of Unused Credits.—
(1) Allowance of credit.—If the amount of the credit determined under subsection (a)(1) for any taxable year exceeds the limitation provided by subsection (a)(2) for such taxable year (hereinafter in this subsection referred to as "unused credit year"), such excess shall be—

based upon "credit earned" for the taxable year. If a cooperative's ratable share of qualified investment in section 38 property . . . is zero then its "credit earned" is zero. Therefore, there would be no "unused" investment credit for the taxable year to be carried over to other taxable years.

*Helena Cotton Oil Co.*, a Tax Court decision, and Chief Judge Devitt in *Farmer's Union Marketing & Processing Ass'n.* adopt Rev.Rul. 70–328's conclusion that when section 38 property is placed into service in a loss year, § 46(d)(2) "taxable income" is zero and thus the cooperative's qualified investment is zero. Conversely, we think this conclusion to be erroneous not only since it serves to frustrate the congressional intent in the enactment in 1962 of § 38, the investment credit statute, but is also contrary to the more reasonable construction of other relevant sections of the Internal Revenue Code.

It is important to note, at the outset, that the legislative history discloses that the investment credit provision was designed to

> increase . . . the profitability of productive investment by reducing the net cost of acquiring new equipment [as well as to] stimulate investment in capacity expansion and modernization, contribute to growth of our productivity and output, and increase the competitiveness of American exports in world markets.

H.R.Rep.1447, 87 Cong.2d Sess., 1962–3, C.B. 419, 441, quoting from the President's Economic Report.

This theme was echoed by the Senate Finance Committee:

> [T]he objective of the investment credit is to encourage modernization and expansion of the Nation's productive facilities and thereby improve the economic potential of the country, with resultant increase in job opportunities and betterment of our competitive position in the world economy. [Reducing the net cost of new equipment] will have the effect of increasing the earnings of new facilities over their productive lives and increasing the profitability of productive investment. It is your Committee's intent that the financial assistance represented by the credit should itself be used for new investment, thereby further advancing the economy. Only in this way will the investment credit serve the overall national interest in greater productivity, a healthy and sustained economic growth, and a better balance in international payments.

S.Rep.1881, 87th Cong.2d Sess., 1962–63, C.B. 705, 717–18;[13] U.S.Code Cong. & Admin.News 1962, pp. 3304, 3314.

In the case of cooperatives, as well as certain other special status taxpayers (see 26 U.S.C. § 46), Congress specifically designated the computational steps in § 46(d) for the purpose of reducing the tax benefit from section 38 investment credit by the extent to which such organizations have a comparative tax advantage arising from their special tax status. Moreover, this was

---

1970 (determined without regard to this sentence), this paragraph shall be applied by substituting "10 taxable years" for "7 taxable years" in subparagraph (B) and by substituting "13 taxable years" for "10 taxable years" and "12 taxable years" for "9 taxable years" in the preceding sentence.

(2) Limitation.—The amount of the unused credit which may be added under paragraph (1) for any preceding or succeeding taxable year shall not exceed the amount by which the limitation provided by subsection (a)(2) for such taxable year exceeds the sum of—

(A) the credit allowable under subsection (a)(1) for such taxable year, and

(B) the amounts which, by reason of this subsection, are added to the amount allowable for such taxable year and attributable to

taxable years preceding the unused credit year.

The foregoing provision entitles plaintiff to carry forward unused investment credit from 1970, the year in which the new section 38 property was placed in service, and thus to offset its entire tax liability for 1971 and 1972.

**13.** We observe that the Fifth Circuit has recently recognized the necessity to construe the investment credit provision in light of its legislative history. In so doing, our appellate court concluded that "[t]he investment credit was added to the Internal Revenue Code to stimulate the economy through encouraging investment in additional capital equipment." *Holloman v. C. I. R.*, 551 F.2d 987, 988 (5 Cir. 1977).

the specific reason for the insertion of the ratable share formula in § 46(d)(2)(C). The legislative history makes this manifestly clear:

> [I]n the case of cooperatives, the qualified investment and the [$25,000] tax liability limitations to be taken into account *are reduced in the same proportions in which their taxable income is reduced [by deductions made available because of their special tax status].* (Emphasis added).

S.Rep.1881, at 419; U.S.Code Cong. & Admin.News 1962, p. 3323.

Juxtaposing the expressed legislative purpose for adding § 38 to the Internal Revenue Code with the equally plain legislative statement of the function of § 46(d)'s ratable share formula, justifies, in our view, the conclusion that Congress intended § 521 cooperatives to have the full benefit of § 38 investment credit, unless, and to the extent that, they receive tax benefits from § 1382 deductions,[14] notwithstanding the fact that section 38 property is placed into service in a loss year.

The legislative history of the investment credit provision, as we comprehend it, persuades us that *Helena Cotton* and *Farmers Union* erroneously conclude that the availability of investment credit to a cooperative turns upon whether section 38 property was placed into service in a loss year. In *Helena Cotton,* supra, the Tax Court concluded:

> A cooperative is a special class of taxpayer that is not allowed the full investment credit. The allowance is reduced in proportion to the special benefits received.
>
> .   .   .   .   .
>
> In the regular course of its operations a cooperative receives only a small investment credit because only a small part of its income is taxed like that of a regular taxpaying cooperative. But a cooperative does not suddenly acquire the full

status of a regular taxpaying cooperative simply by incurring a loss  .   .   . .  It is still entitled only to a ratable share of the investment credit. Its ratable share in a loss year is nothing because the cooperative is not treated as a regular taxpaying corporation in a loss year.

60 T.C. at 133. To us, a fair reading of the relevant legislative history shows that cooperatives are, in fact, to be treated as "regular taxpaying corporations" when they do not receive special tax benefits by virtue of being taxable under § 1381 et seq. The occurrence of a loss year when section 38 property is placed into service is simply *not* a congressionally mandated variable in the § 46(d)(2)(C) ratable share formula. Indeed, the defendant's argument would, if carried to its logical conclusion, produce a situation where one cooperative which has a $1 net profit for the year when it places section 38 property into service and claims no special deductions, would have the full benefit of the investment credit; whereas, another cooperative which sustains a $1 loss in otherwise identical circumstances would have "zero" investment credit. This unreasonable, if not capricious, product of defendant's argument, absent any legislative purpose to achieve such an arbitrary result, deprives defendant's position of persuasive merit. Defendant's contention directly collides with established rules of statutory construction relevant to interpretation of revenue measures. Highly pertinent is the principle which acknowledges that "[a] desire for equality among taxpayers is to be attributed to Congress, rather than the reverse." *Colgate-Palmolive-Peet Co. v. United States,* 320 U.S. 422, 425, 64 S.Ct. 227, 230, 88 L.Ed. 143, 146 (1944). See Sutherland, Statutory Construction § 6603, at 188 (1973).

---

**14.** The regulation, Reg. 1.46–4(c), implementing § 46(d)(2) supports this view.

(a) Cooperatives (1) in the case of a cooperative organization described in section 1381(a)—

.   .   .   .   .

(i) the qualified investment with respect to each section 38 property  .   .   . and

(ii) the $25,000 amount  .   .   . relating to the limitation based on amount of tax, *shall be reduced to such cooperatives ratable share* of such amount  .   .   . .
(Emphasis added).

"Taxable income", however, is a vital factor in that formula. To give effect to the perceived legislative purpose for the investment credit statute as it appertains to the special tax treatment of cooperatives, we hold that "taxable income" as used in § 46(d)(2)(C) may be a negative amount.[15] In so deciding we note with deference Chief Judge Devitt's contrary analysis in *Farmer's Union* is primarily based upon § 172's authorization of carry forward and carry back of net operating losses.[16] This, we believe, to be inapposite here. His application of § 172 to prohibit any investment credit to a cooperative arising from a loss year is sufficiently succinct to permit quotation in full:

> [Section 172] obligates cooperatives (as well as many other business associations) to carry back a net operating loss to the three preceding taxable years. If all this previous income is eliminated . . . a cooperative is obligated to carry the unused loss forward to the five succeeding taxable years. When previous or subsequent income is reduced through this process, the taxpayer gets a refund. The net result and goal of the statute is to make all taxpayers entitled to the . . deduction average their taxable incomes over a period to zero or a positive figure. Thus, a cooperative with taxable income . . . sufficient to absorb the . . losses incurred in other years, will never . . . suffer a tax loss. Rather, the ultimate taxable income figure for the loss year after all of the loss is deducted will be zero.

77–1 USTC ¶ 99213, p. 86, 381. In our view, the basic weakness in this analysis is that, without reference to the legislative history and purpose of the 1962 investment credit statute, it, though lucidly stated, nevertheless fails, we think, to accord due weight to the ratable share formula in favor of a conceptual analysis [17] of a much older statute granting a specific deduction to corporations generally, including § 521 cooperatives.

Moreover, in addition to producing a result at odds with the plain legislative history, the opposite view urged by the defendant fails to take proper cognizance of the fact that Congress did *not* provide that "taxable income" in § 46(d)(2)(C) may not be less than zero. It is authoritatively settled that this congressional omission mandates the use of the general definition of taxable income provided in § 63(a),[18] i. e., "gross income minus the deductions allowed." It necessarily follows that an excess of deductions over income—a loss year—will yield a negative figure as § 63(a) defines taxable income.

Since the § 63(a) definition of taxable income manifestly was deemed adequate by the Congress to implement its accommoda-

---

**15.** Consequently, when a cooperative sustains a loss in a year in which it claims no special deductions and places section 38 property into service, the full investment credit is available. For example, assuming, a $50,000 loss and a $100,000 qualified investment, the ratable share of such cooperative would be computed as follows:

$$\frac{(50,000)}{(50,000)} = 1 \times \$100,000 \times .07 = \$7,000.$$

**16.** Section 172(a) allows "as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year." The first legislation to permit the excess of expenses over income in one tax year to be deducted in another tax year was enacted in 1919, see Act of Feb. 24, 1919, c. 18, § 204, 40 Stat. 1060, 43 years before the Revenue Act of 1962 placed the investment credit formula in the Internal Revenue Code.

**17.** Assuming the theoretical operation of § 172 was accurately described in *Farmer's Union,* no such recomputation of taxable income for the loss year is authorized under § 172. In fact taxable income for the loss year continues to be the negative figure which determines the amount of net operating loss deduction.

**18.** As stated by the United States Supreme Court in *United States v. Foster Lumber Co., Inc.,* 429 U.S. 32, 37, 97 S.Ct. 204, 207, 50 L.Ed.2d 199, 204, n. 3 (1976),

> Congress has specifically tailored definitions of taxable income in other sections of the Code *when the § 63(a) definition is inadequate for its purposes.* See, e. g., IRC § 593(b)(2)(E) (mutual savings banks); IRC § 832(a) (insurance companies); IRC § 852(b)(2) (regulated investment companies). (Emphasis added).

tion of the special tax status of cooperatives with § 38's investment credit, we are bound to apply that definition, in rejection of the defendant's point of view which impermissibly calls for judicial rewriting of an Act of Congress.

Let an Order issue accordingly.