JUNIATA FARMERS COOPERATIVE ASSOCIATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4265–62. Filed March 22, 1965.

*Robert C. Guenzel,* for the petitioner.
*Ivan L. Onnen,* for the respondent.

MULRONEY, *Judge:* Respondent determined deficiencies in income taxes of the petitioner for the taxable year ended November 30, 1958,

---

in the amount of $189,432.67 and for the taxable year ended November 30, 1959, in the amount of $136,141.79. In an amendment to his answer filed April 3, 1964, respondent claimed an additional deficiency for the year 1958 in the amount of $43,586.92.

The principal issue is whether petitioner, a farmer cooperative corporation, properly allocated income not derived from patronage, to patrons on a patronage basis so as to render such income deductible under section 522(b)(1), I.R.C. of 1954.[1]

A second issue, raised by amendment to answer, involves the correctness of petitioner's deduction of $83,821 from its 1958 grain storage and handling income for estimated damage to grain shipped to the Commodity Credit Corporation.

### FINDINGS OF FACT

The parties filed no written stipulation of facts although it is clear the facts are practically undisputed and most all of them should have been stipulated and the trial shortened. Rule 31(b), Tax Court Rules of Practice. Some facts were stipulated during the trial and they are found accordingly.

The petitioner is a farmer cooperative corporation organized under the laws of the State of Nebraska with its principal office at Juniata, Nebr. It holds a letter of exemption from the Internal Revenue Service. It files its returns on a fiscal year basis ending November 30 and keeps its books on an accrual basis. It filed timely corporate income tax returns for the years ending November 30, 1958, and November 30, 1959, with the district director of internal revenue at Omaha, Nebr.

Petitioner was originally organized in the 1930's. Up until 1951 it operated solely as a grain-handling cooperative, performing the functions of storing and marketing grain for its patrons. In 1951 it established a feed merchandising department and in 1954 it began operating a fertilizer (sometimes called anhydrous) department. In its grain department it marketed the products of members and other patrons and turned back to them the proceeds of sales less the necessary marketing expenses on the basis of bushels of grain furnished by members and patrons. In its two merchandising departments it purchased its feed and fertilizer for the use of members and other patrons which it turned over to them at actual cost plus necessary expenses.

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

In the fiscal year ended November 30, 1958, petitioner had patronage dividends in each of its three departments allocated to members and patrons, as follows:

| | |
|---|---:|
| Grain | $293, 906. 40 |
| Fertilizer | 30, 672. 40 |
| Feed | 47, 489. 50 |
| | |
| Total | 372, 068. 30 |

In the fiscal year ended November 30, 1959, petitioner had patronage dividends in each of its three departments allocated to members and patrons, as follows:

| | |
|---|---:|
| Grain | $213, 791. 04 |
| Fertilizer | 31, 259. 29 |
| Feed | 20, 042. 05 |
| | |
| Total | 265, 092. 38 |

The total amount of patronage dividends that was available for distribution in the grain department was allocated to the members and other patrons of the grain department on the basis of bushels of grain that they delivered to the grain elevator. The amount of patronage dividends in the two purchasing departments was allocated to the members and patrons of each department on the basis of the dollar value of their purchases of feed and fertilizer.

Petitioner excluded the total amount of patronage dividends, $372,068.30, in its computation of taxable income in 1958. In 1959 petitioner made an adjustment to its computation of total patronage dividend and only excluded $261,811.13.[2] Respondent concedes petitioner's exclusions for patronage dividends for its fertilizer and feed departments were correct.

Petitioner's computation of the grain department exclusion shows that it is based upon receipts of $291,070.92 and $340,657.63 for the storage and handling of grain for the fiscal years 1958 and 1959, respectively. It is admitted about 90 percent of these sums, or $261,963.83 and $306,591.87, respectively, was received from the Commodity Credit Corporation (hereinafter sometimes referred to as CCC) for the storage and handling of grain, most of which would constitute "income not derived from patronage." Respondent concedes amounts of storage income received from CCC which were attributable to storage prior to the takeover date could be considered patronage income and now concedes on brief that petitioner could exclude patronage dividends in its grain department for the fiscal years 1958 and 1959

---

[2] The adjustment subtracts $3,281.25, described as: "Difference between computation and total amount allocated to individuals."

in the amounts of $102,802.17 and $52,918.68, respectively.[3]  This leaves the amounts of $191,104.23 and $157,591.11 as nonpatronage income received from CCC for the fiscal years 1958 and 1959, respectively, which respondent now determines is not excludable from petitioner's taxable income.

Substantially all of the patrons of the two purchasing departments were also patrons of the grain department.  The manner of the allocation of patronage dividends was explained to petitioner's patrons in earlier years and it is stipulated this manner of allocation was acceptable to petitioner's patrons in the taxable years ending November 30, 1958, and November 30, 1959.

In its income tax return for the taxable year ended November 30, 1958, the petitioner reported as income all of its storage and handling income except $83,821, the omission of this amount being based on the theory that a loss had occurred because of spoilage and damage to stored grain and that such loss should be offset against the storage and handling income.

The claimed loss of $83,821 relates to 353 carloads of wheat and corn shipped by the petitioner to the CCC during the period from November 1958 to June 1959.

As of November 30, 1958, the petitioner had not been notified by the CCC of any amounts for which it was liable to the CCC for spoilage or damage to grain which had been shipped during the taxable year which ended on that date.

The petitioner did not sustain a deductible loss of $83,821 in its taxable year ended November 30, 1958, because of damage to grain shipped by it to the Commodity Credit Corporation during the period from November 1958 to June 1959.

OPINION

Section 522(b)(1)(B), applicable to the years in question, allows an exempt cooperative corporation to deduct from its gross income "amounts allocated during the taxable year to patrons with respect to its income not derived from patronage."  Respondent's regulations (sec. 1.522–2(d), Income Tax Regs.) provide, in part, as follows:

As used in this paragraph, the term "income not derived from patronage" means incidental income derived from sources not directly related to the marketing, purchasing, or service activities of the cooperative association. * * * Business done with the United States shall constitute income not derived from patronage. In order that the deduction for income not derived from patronage may be

---

[3] This concession is pursuant to Rev. Rul. 59–107, where the Commissioner has ruled: "When, as part of the price support program, money is loaned to a farmer-producer on his warehouse receipt for grain stored in a nonexempt cooperative, storage charge paid by the Commodity Credit Corporation for the period prior to default are income allocable to members as patronage dividends and are excludable from the cooperative's income if there was a preexisting obligation to allocate such patronage income." 1959–1 C.B. 20.

applicable, it is necessary that the amount sought to be deducted be allocated on a patronage basis in proportion, *insofar as is practicable*, to the amount of business done by or for patrons during the period to which such income is attributable. [Emphasis added.]

Petitioner allocated the nonpatronage income received from the CCC to all of the patrons of its grain department, members and non-members alike, on the basis of the bushels of grain they delivered to the grain elevator. Respondent is not satisfied with this, but insists that the nonpatronage income should also have been allocated to the patrons of the petitioner's two purchasing departments. Otherwise, argues respondent, the requirements of the statute and regulations are not met. Respondent cites no cases in point and states on brief that he has found no cases interpreting the statute. We are not at all convinced that there is any merit in respondent's argument. He offers no compelling reason why nonpatronage income of the grain department should be allocated indiscriminately to patrons of other departments. However, for the purpose of this case his argument is without force. It fairly appears from stipulated facts and the testimony of witnesses that substantially all of the patrons of the marketing department were patrons of the two purchasing departments. Under these facts we believe that petitioner chose an acceptable method of allocating its nonpatronage income when it made the allocation to the patrons of its grain department since, in all probability, such patrons were the same as the patrons of its other departments.

The regulations, perhaps in recognition of the insurmountable bookkeeping and recordkeeping problem which could arise where a cooperative corporation, such as petitioner, combines the marketing function with the purchasing function, wisely adopt a practical approach. See *Farmers Cooperative Co.* v. *Birmingham*, 86 F. Supp. 201 (N.D. Iowa). We think that petitioner's method of allocation reaches a fair and equitable result for its patrons who, we might add, were all fully cognizant of the method of allocation of patronage dividends and (it is stipulated) deemed it acceptable to them in the years before us. We sustain petitioner on this issue.

In a recent case the Court of Appeals for the Eighth Circuit, in a somewhat related problem involving nonexempt cooperative corporations, expressed some doubt in a footnote "whether the Commissioner has sufficient standing to object to the taxpayer's method of allocating what would normally be income excludable to the taxpayer among its member-patrons in a manner apparently acceptable to such members as an equitable distribution of profits." *Pomeroy Cooperative Grain Co.* v. *Commissioner*, 288 F. 2d 326. The court also stated that "From a revenue standpoint, the Commissioner should be more concerned with the total exclusions allowable on membership business profits rather than the means by which such profits are divided among the qualified members." Similarly, in this case, whether we stress the

equitable nature of the allocation or whether we keep revenue considerations uppermost in mind, we do not believe that respondent has offered any compelling reason for his objection to the method of allocation chosen by petitioner to distribute its nonpatronage income to its patrons.

Respondent also makes an alternative argument that the petitioner's failure to allocate its nonpatronage income from the CCC to all of its patrons constitutes an inequality of treatment which causes it to lose its exempt status. We believe this argument is fully answered by our discussion earlier in this opinion to the effect that petitioner's method of allocation is a fair and equitable one, fully acceptable to its patrons. There is no merit in respondent's argument under the facts of this case.

The next issue is whether petitioner correctly omitted $83,821 from its storage and handling income in the taxable year ended November 30, 1958, because of purported spoilage and damage to stored grain. The purported loss relates to grain which was shipped by the petitioner to the CCC during the period from November 1958 to June 1959.

Respondent raised this issue in his amended answer and, therefore, has the burden of proof. Petitioner does not argue this issue in its brief. It is clear, however, that there is no justification for omitting or deducting this amount from petitioner's income in its fiscal year 1958. It is apparent from the testimony of petitioner's auditor that this omission of $83,821 was little more than a conjecture on his part that the stored grain was damaged in this amount. He admitted in his testimony that "it wasn't an actual loss" but was more of a reserve for loss. Two of petitioner's officials, called as witnesses, testified that they did not participate in preparing the estimate. By the end of petitioner's taxable year ended November 30, 1959, a loss of only about $25,000 had been established due to spoiled and damaged grain, and it appears from the evidence that petitioner did not make any payments on account of spoiled grain until August 1959.

As of November 30, 1958, the estimated amount of $83,821 represented nothing more than a reserve for a contingent liability. Whatever liability petitioner would ultimately incur to the CCC for spoilage on account of the grain shipped during the period November 1958 to June 1959, the record is clear that the amount of such liability could not be determined at the end of the fiscal year 1958. There was no closed and completed transaction in the fiscal year 1958 indicated by some identifiable event to support a loss deduction in that year. Nor could petitioner, an accrual basis taxpayer, accrue such liability or expense in the fiscal year 1958 since the liability was still contingent. *Brown* v. *Helvering*, 291 U.S. 193; *David J. Joseph Co.* v. *Commissioner*, 136 F. 2d 410, affirming a Memorandum Opinion of this Court. We sustain respondent on this issue.

*Decision will be entered under Rule 50.*