ASSOCIATED MILK PRODUCERS, INC. (SUCCESSOR TO ROCHESTER DAIRY COOPERATIVE), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1493–75. Filed August 25, 1977.

*Irving Clark,* for the petitioner.
*Gerald W. Leland,* for the respondent.

FAY, *Judge:* Respondent determined deficiencies in petitioner's corporate income taxes as follows:

| TYE Sept. 30— | Deficiency | TYE Sept. 30— | Deficiency |
| --- | --- | --- | --- |
| 1962 | $59,638.33 | 1966 | $13,187.01 |
| 1963 | 54,963.19 | 1967 | 9,600.12 |
| 1964 | 115,043.14 | 1968 | 19,362.00 |
| 1965 | 15,083.79 | | |

Petitioner having conceded certain of the adjustments contained in the notice of deficiency, the issues remaining for our decision are as follows:

(1) Whether petitioner, a dairy cooperative subject to the provisions of subchapter T (secs. 1381–1388),[1] is entitled to offset its net income for the years 1962 through 1966 by the carryforward of net operating losses incurred prior to 1962;

(2) Whether petitioner is entitled to deduct certain amounts which it paid to cover deficits of a patrons' trust which provided life insurance for patrons.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner is an agricultural cooperative organized and existing under the laws of the State of Kansas, with its principal place of business in San Antonio, Tex. Petitioner is the successor of Rochester Dairy Cooperative, which merged into petitioner in 1969, and upon whose tax liabilities this case is based. For convenience Rochester is sometimes hereinafter referred to as petitioner.

During all of the taxable years at issue, Rochester was an agricultural cooperative, organized and operating under the laws of Minnesota, and dealing in dairy products. It operated a milk processing plant in Rochester, Minn., at which it received raw milk from its member-patrons and processed it into various products, including pasteurized fluid milk (both in bulk and packaged for retail sale), butter, and dried milk powder. For its fiscal years ended September 30, 1959, 1960, and 1961, Rochester filed income tax returns on Form 990–C as an exempt farmers' cooperative under section 521. Commencing with its 1962 fiscal year and for all subsequent years at issue, Rochester did not claim exempt status under section 521, but filed corporation income tax returns on Forms 1120.[2]

During the years at issue, a milk producer could become a member-patron of Rochester by purchasing 1 share of $1 voting stock. After becoming a member-patron, the producer was entitled to deliver milk to Rochester's processing facilities

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.

[2] Despite the tax "exemption" provided to certain farmers' cooperatives under sec. 521, such cooperatives are subject to the corporation income tax and the alternative tax on capital gains (sec. 1201), but with special deductions allowed for patronage dividends, which normally result in no taxable income. The tax treatment of cooperatives is set forth in secs. 1381–1388 (subch. T), which sections were adopted in 1962 to replace comparable provisions in sec. 522, which was then repealed.

for which the producer was paid (on a semimonthly basis) at approximately the going market price for raw milk in the area. Rochester did not enter into contracts with its patrons, and its patrons were not obligated to deliver any particular volume of milk. A patron could discontinue doing business with Rochester at any time.

The following schedule represents the number of patrons at the beginning and end of Rochester's fiscal years 1959 through 1965, the number of patrons who joined or rejoined Rochester, and the number of patrons who canceled each year:

| FYE Sept. 30— | Beginning patron count | Additions | Cancellations | Closing patron count |
|---|---|---|---|---|
| 1959 | 1995 | 319 | 393 | 1921 |
| 1960 | 1921 | 184 | 460 | 1645 |
| 1961 | 1645 | 131 | 355 | 1421 |
| 1962 | 1421 | 45 | 467 | 999 |
| 1963 | 999 | 306 | 202 | 1103 |
| 1964 | 1103 | 217 | 333 | 987 |
| 1965 | 987 | 128 | 142 | 973 |

Rochester utilized the basic cooperative principle of patronage refunds or credits. That is, the annual net income of the cooperative (i.e., the excess of proceeds from sale of processed dairy products over the costs of operation, including amounts paid to member-patrons for raw milk) was allocated to the member-patrons on the basis of the relative amount of patronage during the year. Such allocation could either be paid in cash or merely credited to the account of the patron on the cooperative's books, and the cash retained by the cooperative as additional working capital.[3] This latter method resulted in the creation of so-called "capital reserve accounts" allocated to the individual patrons on Rochester's books. At the end of its 1958 fiscal year Rochester had a total of $1,447,038.92 in such capital reserve accounts.

---

[3] The basic Federal income tax structure applicable to these cooperative principles is to eliminate any tax at the cooperative level by permitting a deduction for patronage allocations (sec. 1382), but to require such allocations to be included in the gross income of the patron (sec. 1385). In most instances this basic principle applies even though the patronage allocation is not paid in cash, provided the noncash allocation meets certain prescribed standards (sec. 1388).

Prior to amendment in 1962, Rochester's articles of incorporation contained the following provisions here pertinent:

### ARTICLE IV

Section 1. This association shall be operated without profit. It shall be so operated that the current and active patrons of the association, members and non-members alike, will currently furnish money through their patronage for capitalizing the association and with the view of revolving the capital furnished in earlier years by the patrons and others.

   \* \* \*

In the event the association suffers a loss in any year, such loss shall first be charged against the capital-reserve accounts. Provided, however, to the extent that it shall be lawful, the board of directors shall prescribe the basis on which the capital contributions, including capital-reserve accounts, of the patrons shall be reduced on account of any such loss so that the loss will be borne by the patrons on a basis deemed equitable by the board of directors. All capital furnished by deductions or otherwise under specific contracts with patrons shall also be evidenced by preferred-stock, certificates of interest, certificates of indebtedness, or credited to patrons in the capital-reserve accounts of the association, and such preferred stock certificates, certificates of interest, certificates of indebtedness, and credits shall be subject in all respects to the provisions of these articles regarding such certificates and credits.

   \* \* \*

Section 4. Net income, if any, in excess of dividends and additions to reserves and surplus shall be distributed on the basis of patronage. Distribution in such event shall be made to member-patrons and non-member-patrons alike on a patronage basis in the forms of preferred stock, certificates of interest, certificates of indebtedness, or cash. Capital reserves and surplus shall be allocated and credited to the patrons on the basis of their patronage, and the records of the association shall show the interest of the patrons in the reserves and surplus. Stockholders, as such, shall have no property rights in any capital reserves or surplus, but all patrons, whether stockholders or nonstockholders, shall have such rights in proportion to their contribution to the aggregate capital reserves or surplus of the association. To the extent permitted by law it shall be the intention of this cooperative association to operate in such manner that it shall have no net income.

Substantially identical provisions were contained in Rochester's bylaws. At Rochester's annual meeting in December 1962 the articles of incorporation and bylaws were amended to eliminate the second paragraph quoted above, dealing with the treatment of losses.

As a result of poor management, Rochester suffered losses from its operations in the amounts of $192,433.70 for the 1959

fiscal year and $368,274.66 for its 1960 fiscal year. In the balance sheets contained in its income tax returns for those respective years, Rochester reflected its capital reserves in amounts which had been reduced by these respective losses. However, the board of directors of Rochester, in considering the proper handling of these losses, determined that it would be inequitable to charge the current losses against the capital reserve accounts, which accounts had been established based upon prior years' patronage. Because of the turnover of patrons from year to year, some patrons of prior years would have had their reserve accounts reduced even though they were not patrons during the loss years. The board also feared that the reduction of prior reserve accounts would anger the patrons, resulting in a serious loss of future business to competing dairies. Accordingly, the board determined that the 1959 and 1960 losses should be in effect carried forward to future profitable years, by reducing or eliminating what would otherwise be the patronage refund allocations of such future years. Accordingly, net income of the years 1962 through 1966 was offset and patronage refund allocations eliminated until the entire amount of the prior years' losses was absorbed.

In its tax returns for its fiscal years ended September 30, 1959 and 1960, Rochester reported deductions in excess of gross income in the amounts of $192,433.70 and $368,274.66, respectively. In its tax return for its fiscal year ended September 30, 1961, Rochester reported a net loss of $11,749.25. Included in its 1961 return were the following pertinent items:

| | |
|---|---|
| Net income before patronage dividend deduction ................. | $15,831.75 |
| Portion of loss on sale of building written off for book purposes in prior year ......................................................... | 12,500.00 |
| Charitable contributions in excess of 5-percent limitation .. | 750.75 |
| Patronage dividend ................................................................. | 27,581.00 |

For the 5 years preceding its 1959 fiscal year Rochester had no taxable income to which it could carryback a net operating loss. On its income tax returns for the years commencing with the year ended September 30, 1962, Rochester claimed net operating loss carryforward deductions pursuant to section

172, and utilized the claimed net operating losses to offset net income in the following amounts:

| FYE Sept. 30— | Net operating loss utilized | FYE Sept. 30— | Net operating loss utilized |
|---|---|---|---|
| 1962 | $104,453.37 | 1965 | $55,455.93 |
| 1963 | 165,583.37 | 1966 | 10,912.55 |
| 1964 | 264,835.62 | | |

Throughout the years at issue, Rochester faced stiff competition from commercial creameries and other cooperatives in attracting and retaining member-patrons who would provide a steady supply of raw milk. Rochester had a very large physical plant and required a substantial amount of raw milk daily in order to utilize the plant at optimum efficiency. Thus, it was vital to maintain membership and to maximize the supply of milk in order to avoid substantially higher unit costs which resulted from operation of the plant below capacity.

In an effort to make membership more attractive and thereby compete more effectively for milk suppliers, in 1965 Rochester established a program to provide life insurance and retirement benefits for its patrons. On April 1, 1965, a trust was established, denominated "Rochester Dairy Cooperative Patrons' Beneficial Trust" (hereinafter sometimes referred to as the Patrons' Trust). Under the program, Rochester withheld from its normal payments to members for milk a "retain" of 2 cents per hundredweight of milk delivered. These retained amounts were then paid over by Rochester to the Patrons' Trust, which utilized the funds to pay for insurance on the lives of the respective patrons. Each participant in the plan was entitled to a minimum level of insurance coverage, and the amount of coverage increased incrementally with the volume of patronage with Rochester.

This program was well received by Rochester's patrons. During the first years of operation of the plan and the Patrons' Trust, the amounts paid by the members through retains paid for most, but not all, of the costs of the Patrons' Trust. In these circumstances Rochester made payments to the Patrons' Trust out of its general funds sufficient to cover the trust's deficits in the amounts of $5,845.92 in fiscal 1966, $7,900 in fiscal 1967, and $8,800 in fiscal 1968. After these

initial years the trust did not run deficits, and Rochester made no further such contributions. Respondent has disallowed the amounts so paid in the 1966 through 1968 fiscal years as deductions in Rochester's returns for those years.

The payments by Rochester from its general funds to make up the deficits of the Patrons' Trust were ordinary and necessary business expenses of Rochester.

OPINION

Respondent has disallowed petitioner's net operating loss carryforward deductions for the years 1962 through 1966. These deductions were claimed under section 172, based upon net operating losses reported by petitioner for the years 1959 through 1961. Respondent does not here dispute the amounts of the reported net losses from operations during 1959 and 1960;[4] he does, however, contest petitioner's right to utilize the net operating loss carryover deduction of section 172.

Respondent's position in this case is not based upon any statutory exception to the loss carryover privilege, clearly stated in section 172, but upon respondent's theoretical perception of a cooperative as an exceptional entity which by its nature cannot ordinarily have a net operating loss for tax purposes. Respondent argues that the basic principle of a cooperative is that it operates at cost (after patronage dividend allocations) for its member-patrons. Pursuant to this "cost" principle, respondent contends, in any year in which expenses exceed gross income, this "loss" must be recouped from the members who were patrons for that period (i.e., the exact converse of a patronage dividend allocation when income exceeds expenses), so that the cooperative will then have operated at cost. The recovery of the operating deficit from the current patrons would thus eliminate any net operating loss for tax purposes. Respondent contends that Rochester was bound by its own articles of incorporation to recover losses in this fashion, and that case law supports its right to do so.

---

[4] Respondent has challenged the $11,749.25 net loss reported for 1961. This sub-issue is dealt with hereinafter.

We consider respondent's position herein not only contrary to the express provisions of section 172, but conceptually strained and lacking any fundamental policy support; in short, an unwarranted tinkering with the tax structure applicable to cooperatives. The deductions claimed are clearly authorized by section 172. There is nothing within that section or the regulations thereunder which indicates that the net operating loss deduction is not applicable in the case of a cooperative subject to subchapter T. In fact, quite to the contrary, the utilization of the net operating loss deduction by cooperatives is clearly implicit in certain subsections of the Code and the Income Tax Regulations, and in various of respondent's rulings dealing with cooperatives.

At the outset we note that section 172 itself contains a subparagraph applicable specifically to a certain type of cooperative. Section 172(b)(1), dealing with the years to which losses may be carried, refers specifically in subparagraph (G) to Banks for Cooperatives.[5] Section 172(b)(1)(G) reads as follows:

(G) In the case of a Bank for Cooperatives (organized and chartered pursuant to section 2 of the Farm Credit Act of 1933 (12 U.S.C. 1134)), a *net operating loss* for any taxable year beginning after December 31, 1969, shall be a *net operating loss carryback* to each of the 10 taxable years preceding the taxable year of such loss and shall be a net *operating loss carryover* to each of the 5 taxable years following the taxable year of such loss. [Emphasis added.]

Although this paragraph was adopted in 1969, subsequent to the years at issue herein, it was adopted for the purpose of lengthening the carry period for losses of this type of cooperative, and its legislative history clearly indicates the previously existing availability of section 172. The Senate Finance Committee report contains the following pertinent language:

5. Banks for Cooperative (sec. 905 of the bill and sec. 172 of the code)
*Present law.*—Under present law the thirteen existing banks for cooperatives are not allowed the same bad debt reserve deduction as commercial banks because they do not receive deposits, and, therefore, are not treated as banks under Internal Revenue Service rulings. Nor are these banks allowed any different net operating loss carrybacks than regular

---

[5] Banks for Cooperatives are themselves cooperative organizations. See 12 U.S.C. sec. 1134 (1970).

corporations. *In other words, they are allowed a 3-year carryback and a 5-year carryforward of net operating losses.*

    \* \* \*

    *Explanation of provision.*—For the above reasons, the committee amendments provide that banks for cooperatives (as defined in section 2 of the Farm Credit Act of 1933) are to be allowed a 10-year net operating loss carryback, in addition to the 5-year carryforward now available.

    [Emphasis added. S. Rept. 91–552 (1969), 1969–3 C.B. 423, 599.]

In addition, the regulations under subchapter T, governing the tax treatment of cooperatives, although not specifically authorizing the utilization of the net operating loss deduction, make several specific references to the deduction. See secs. 1.1383–1(a)(2) and 1.1383–1(b)(3), Income Tax Regs. An example contained in sec. 1.1383–1(d), Income Tax Regs., includes the following sentence:

In addition, under this alternative method the X Cooperative cannot use $50,000 as a deduction for 1966 so as to increase its net operating loss for such year for purposes of computing a net operating loss carryback or carryover.

Respondent's position herein is also inconsistent with references to net operating loss deductions in several published rulings dealing with cooperatives. See, for example, Rev. Rul. 70–328, 1970–1 C.B. 5, reciting that the subject cooperative's operations "resulted in a net operating loss as defined in section 172(c) of the Code." In fact, Rev. Rul. 65–106, 1965–1 C.B. 126, specifically discusses the effect of net operating loss carryovers and carrybacks upon patronage dividend deductions. Moreover, respondent's own income tax Form 990–C, Exempt Cooperative Association Income Tax Return, utilized by Rochester for each of its fiscal years 1959 through 1961, contains a separate line (35(a)) providing for the net operating loss deduction.

Finally, we note two recent cases in which the courts, in deciding whether a cooperative is entitled to a section 46 investment credit for property acquired in a year of a net operating loss, stated as an assumed premise that the section 172 carryback and carryforward would apply to the net operating loss. *Farmers Grain Marketing Terminal v. United States,* 434 F.Supp. 368 (N.D. Miss., June 20, 1977, 40 AFTR 2d 77–5182, 77–2 USTC par. 9533); *Farmers Union Marketing & Processing Assn. v. United States,*    F.Supp.    (D. Minn., Feb. 1, 1977, 39 AFTR 2d 77–963, 77–1 USTC par.

9213). In fact, in *Farmers Union* the presumed availability of the net operating loss carryback and carryover provisions was the very basis for the decision on the investment credit issue.

Respondent relies upon the fact that Rochester's articles of incorporation and bylaws which were in effect at the time that the losses occurred required that these losses be charged against the capital reserve accounts. He asserts that Rochester ignored this provision and improperly carried the losses forward to reduce future year's income which would otherwise have been available for patronage dividends. We disagree with respondent's interpretation of Rochester's articles and bylaws. The requirement that losses first be charged against the capital reserve accounts, in our view, merely stated a general principle that losses should be offset against accumulated income (i.e., capital reserve accounts) before being charged against the capital stock accounts. The principle is equivalent to that of an ordinary corporation charging a loss against its retained earnings account before charging its capital stock, paid-in surplus, or any other capital account. Interpreted in this general sense, the provision in question does not require that the loss in any given year be charged only against the *then existing* capital reserve accounts—as opposed to charging it against net income (which would otherwise be allocated to patrons and become additional capital reserves) in later periods, as petitioner chose to do.

Thus, in one way or another, the losses will be charged against capital reserves. However, in a dogmatic effort to preserve the symmetry of the so-called annual "cost" principle of cooperative operations, respondent insists that the losses of any year must be charged against existing capital reserves, and cannot be carried over and charged against future income. The question naturally arising is: What difference does it make? The only difference which we can perceive is in the effective allocation of the losses among the cooperative's past and future member-patrons. Thus, if the losses are carried forward and reduce income and patronage dividend allocations of later years, the patrons of such later years, many of whom may not have been patrons during the loss years, will effectively bear those losses. On the other hand, if as respondent contends, the losses are charged to capital reserves existing at the end of the loss year, the

burden of the loss might be allocable to the specific patrons of the loss year, but only to the extent that such patrons had capital reserve accounts from prior years' patronage.

Of course, some of the patrons of the loss year may not have been patrons prior to that year, and would thus not have existing capital reserve accounts to which their allocable share of the current year's loss could be charged. Respondent suggests that in these cases the cooperative should seek cash reimbursement from such patrons of the loss year. Although respondent cites cases holding that a cooperative has the legal right to assess patrons for reimbursement of losses, it is not at all clear whether Rochester possessed such legal authority under the law of Minnesota.[6] Moreover, regardless of what might have been Rochester's legal rights, we consider such a recoupment attempt highly impractical for a cooperative operating in a competitive environment, as was Rochester. The impracticality of such a step merely to preserve the "cost" principle of cooperative operation certainly calls into question the sanctity with which respondent views that principle.

The same articles of incorporation and bylaws upon which respondent relies as requiring that losses be charged to capital reserve accounts, go on to provide that the allocation of such charges among the various patrons' reserve accounts is to be determined on an equitable basis by the board of directors. Rochester's board of directors did in fact consider this question and determined that it would not be fair to allocate the losses to existing capital reserve accounts, and that charging them to future net income would be more equitable.

We fail to see any legitimate interest of respondent in the mechanics of petitioner's allocation of losses among its past, current, or future member-patrons. See *Pomeroy Cooperative Grain Co. v. Commissioner*, 288 F.2d 326, 333 (8th Cir. 1961), affg. in part and revg. in part 31 T.C. 674 (1958). The so-called "cost" principle of cooperatives which respondent espouses with unaccountable zeal as the underlying basis for his position in this case appears to have emerged from no greater

---

[6] See *Elliott v. Adeckes*, 59 N.W.2d 894 (Minn. 1953), holding that patrons were not liable to a bankruptcy trustee for deficits of their cooperative; Minn. Stat. Ann. sec. 300.27 (West 1969), providing, inter alia, that no stockholder of a cooperative shall be liable for any debt of the cooperative.

a source than certain incidental language in a 1969 ruling on an unrelated question of cooperative accounting. Rev. Rul. 69–67, 1969–1 C.B. 142, holding that a cooperative's yearend inventories should be valued at cost, contains the following paragraph:

One of the fundamental principles associated with a farmers' cooperative is that it is operated at cost for its patrons. This principle is usually evident when the net earnings (net savings) resulting from the operation of the cooperative from business done with or for its patrons are returned by the cooperative to its patrons in proportion to the amount of business done with or for each patron.

Certainly there is nothing in this language, nor in the substance of the ruling, which would warrant the exaltation of the quoted language into a full-blown principle of tax accounting, rendering the net operating loss carryover unavailable to cooperatives. Respondent has referred to no compelling policy considerations or dangers of tax avoidance which might even warrant an attempt to deny such carryover in the face of the clear language of section 172.

In addition to his basic position prohibiting the carryforward of losses incurred in 1959 and 1960, respondent has also questioned the correctness of the net loss reported by petitioner for fiscal 1961. In its 1961 return petitioner reported net income of $15,831.75 (before its patronage dividend deduction). It claimed a patronage dividend deduction of $27,581, and thus, reported a net loss of $11,749.25. Respondent contends that under section 522 (the predecessor of present subchapter T), which was applicable in 1961, a patronage dividend deduction could not exceed the cooperative's net income for the year. The technical correctness of this assertion is not entirely clear, but it need not be decided here, since the record indicates that in fact Rochester's 1961 patronage dividend did not exceed its *book* net income.

The principal reason that a net *loss* was reported in its 1961 tax return was that the net loss reported for tax purposes on the sale of a building in that fiscal year was $12,500 greater than the loss for *book* purposes on such sale, due to a book write-down for obsolescence in fiscal 1960, which write-down had been charged against 1960 operations, but not deducted in the 1960 return. Thus, the 1961 net income for book purposes,

upon which the patronage dividend was based, was higher than the net operating income for tax purposes.[7] In these circumstances it does not appear that the 1961 patronage dividend exceeded 1961 book income. The net operating loss reported for tax purposes, therefore, resulted from merely a timing difference in connection with the reporting of the loss on the building. Thus, respondent's disallowance of the net operating loss carryforward is no more justifiable with respect to the 1961 net operating loss than it is for the 1959 and 1960 losses.[8]

Accordingly, we hold that respondent erred in disallowing the net operating loss carryover deductions claimed by Rochester for each of the years in question.

The second issue herein involves certain payments by Rochester in its fiscal years 1966 through 1968 to the Patrons' Trust, to cover the deficits of the trust for those years. Petitioner contends that such payments are deductible as ordinary and necessary business expenses under section 162. Respondent, however, views the payments as nondeductible "dividends" to Rochester's member-patrons.

Petitioner basically argues that the establishment of the Patrons' Trust and the related patrons' life insurance plan was intended primarily to make patronage of Rochester more attractive and thereby help increase the essential supply of milk to its large plant. The maintenance of a satisfactory supply of milk from patron dairy farmers in the face of stiff competition was critical to Rochester's ability to operate its plant at economical unit costs. In essence, the plan was promotionally motivated. Respondent, in fact, does not dispute this. The plan was well received and helped Rochester significantly in attracting and retaining patron-suppliers.

---

[7] The exact difference was $11,749.25, consisting of the $12,500 additional loss in connection with the sale of the building, offset by $750.75 in charitable contributions which were a book expense, but not deductible for tax purposes due to the limitations of sec. 170.

[8] In Rev. Rul. 74–274, 1974–1 C.B. 247, it was held that a patronage dividend, as defined in sec. 1388, could not be deducted to the extent it exceeded net income from patronage business reported for *Federal income tax purposes* (in a case where book income was greater than taxable income due to variations in depreciation methods). Although this ruling is not applicable to the year 1961, when sec. 522 was the governing Code section, we have serious doubts as to its correctness even as an interpretation of sec. 1388.

Thus, Rochester had a strong business interest in the continued successful operation of the plan. In these circumstances, the payment of the trust's relatively modest deficits for its first 3 years in order to assure its smooth continuance seems an eminently prudent, ordinary, and necessary expense of Rochester's business.

Section 162(a) provides for[4] the deduction of ordinary and necessary business expenses as follows:

IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

Cases interpreting the phrase "ordinary and necessary" are legion and need not be reexamined in detail here. There are, however, several cases quite similar to the instant case, and which, we believe, clearly establish that under the factual circumstances herein, the payments in question were ordinary and necessary business expenses of Rochester.

It is well established that expenses incurred to protect, maintain, or preserve a taxpayer's business, even though not in the normal course of such business, are deductible as ordinary and necessary business expenses. See, e.g., *United States v. E. L. Bruce Co.*, 180 F.2d 846 (6th Cir. 1950); *L. Heller & Son, Inc. v. Commissioner*, 12 T.C. 1109 (1949); *Catholic News Publishing Co. v. Commissioner*, 10 T.C. 73 (1948).

In *Crowder v. Commissioner*, 19 T.C. 329 (1952), the taxpayer was engaged in the operation of a funeral home. In order to meet competition and preserve his business, he organized a mutual aid association to which members made contributions for burial insurance. The taxpayer, who had no ownership interest in the association, had organized it with the expectation that the insured members would utilize the services of his funeral home. The taxpayer made certain payments to the association to cover operating deficits in its early years. We held that such payments were ordinary and necessary expenses to protect and promote the taxpayer's business, and we consider the *Crowder* case directly analogous here. See also *Hennepin Holding Co. v. Commissioner*, 23 B.T.A. 119 (1931) (expense incurred by landlord to advertise business of important tenant); *Dinardo v. Commissioner*, 22 T.C. 430 (1954) (payments by medical partnership to cover deficits of hospital which was important source of partnership

business); *Snow v. Commissioner,* 31 T.C. 585 (1958) (payments by law firm to cover operating deficits of savings and loan association organized as a source of legal business for the firm). In all of these cases (and a host of others not here cited) the concept of "ordinary and necessary" business expenses was held to include expenditures, even though seemingly made on another's behalf, motivated to protect or promote the taxpayer's business.

Respondent acknowledges Rochester's pressing need to maintain its milk supply in the face of stiff competition and also acknowledges that the insurance plan and Patrons' Trust were materially helpful in Rochester's retaining patrons. Nonetheless, respondent contends that the payments by Rochester to the trust were not ordinary and necessary business expenses, but were for the direct benefit of the patrons who obtained insurance through the trust, and as such, must be treated as dividends. Apparently based in part upon his theoretical view of a cooperative as an effective nonentity incapable of incurring its own business expenses not directly related to patronage activities, respondent's position appears sadly anemic in the face of section 162, as interpreted by the cases discussed above.

Respondent argues in effect that expenses incurred to protect or preserve its business cannot be considered ordinary and necessary business expenses in the case of a cooperative since a cooperative is a neutral entity which merely serves its members, cannot have business objectives of its own, and *should not* continue to operate if it must resort to "extraordinary" payments to patrons in order to induce patronage. Thus, he argues, the indirect payment (through the payments to the Patrons' Trust) of member-patrons' life insurance premiums as an inducement to maintain patronage must be viewed as a dividend to such patrons since if patronage cannot be maintained without such extraordinary payments, the cooperative is not a viable organization and should fail.

Unfortunately, in his preoccupation with the theoretical precepts of cooperative operation, respondent seems to have lost touch with the economic reality of Rochester's particular situation. Rochester operated a very large milk processing plant. Rochester's former chairman testified that this plant was considered the largest of its type in the world. This plant

was owned by Rochester's member-patrons, through their retained equity interest in Rochester. Economical operation of a plant of this size required a substantial volume of raw milk deliveries, and thus, certain levels of patronage were essential. If patronage was inadequate, the plant would operate at a loss, which would have to be borne by the member-patrons. Thus, even if Rochester as an entity is ignored, it is clear that the member-patrons themselves, as beneficial owners of Rochester's plant, had a very real and material interest in the maintenance of patronage levels. In such circumstances, Rochester's expenditures in connection with the Patrons' Trust were no more extraordinary than if Rochester had expended the same amounts in direct mail solicitation costs, or other forms of promotion to potential patrons. The fact that the payments to the trust also incidentally benefited certain member-patrons who were participants in the insurance plan does not vitiate their deductibility. Cf. *Rodgers Dairy Co. v. Commissioner*, 14 T.C. 66 (1950). The two cases relied upon by respondent in support of his claim that the payments should be treated as dividends are clearly distinguishable in that both involved payments by closely held corporations which benefited controlling stockholders, with no corporate business purpose.

Accordingly, we have found as an ultimate fact, and we hold, that the payments by Rochester to make up the deficits of the Patrons' Trust were ordinary and necessary business expenses, deductible under section 162.

*Decision will be entered under Rule 155.*