FORD-IROQUOIS FS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11979–77.     Filed September 9, 1980.

*Arthur E. Bryant, Jr.,* and *Richard A. Hanson,* for the petitioner.

*Allen E. Lang,* for the respondent.

DAWSON, *Judge:* Respondent determined a deficiency of $160,313 in petitioner's Federal income tax for the year 1973.

Certain adjustments have been conceded by both petitioner and respondent. The issues for decision are: (1) Whether petitioner, a nonexempt cooperative, may carry forward under section 172[1] losses incurred in its grain marketing and storage operations to offset income from its farm supply operations, and (2) whether it may carry forward losses incurred in the grain and supply operations arising out of transactions with cooperative members who terminated their membership after the loss year.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioner, an agricultural cooperative incorporated under the Agricultural Cooperative Act of the State of Illinois, had its principal office in Gilman, Ill., at the time it filed its petition herein. During the periods relevant to this case, petitioner was engaged in the business of marketing and storing grain and selling agricultural supplies, including petroleum, fertilizer, and other products to its members and nonmembers. For all the relevant periods, the petitioner did not claim exempt status under section 521. Instead, it filed Federal corporate income tax returns on Forms 1120 as a nonexempt cooperative.[2]

Petitioner is the successor to Ford County FS, Inc. (Ford

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.

[2] The tax treatment of cooperatives is set forth in secs. 1381–1388 (subch. T).

County), a nonexempt agricultural cooperative incorporated under Delaware law, which was merged into petitioner on January 31, 1971. Ford County had its principal office in Melvin, Ill. It marketed and stored grain as well as sold agricultural supplies, including petroleum, fertilizer, feed, and other products to its members and nonmembers. Both Ford County and petitioner did business with their respective cooperative members and nonmembers on the same terms. Ford County reported a net operating loss of $24,639 on its final Federal corporate income tax return for the period January 1, 1971, through January 31, 1971. The loss was generated by member and nonmember business in the cooperative's grain and farm supply operations in the following amounts:

| Operation | Member | Nonmember |
|-----------|--------|-----------|
| Grain | ($7,791) | ($7,142) |
| Supply | (4,647) | (5,059) |

Respondent has calculated that 26 percent of the member grain loss and 3 percent of the member supply loss are allocable to cooperative members who terminated their membership after the loss period.

Petitioner incurred a net operating loss of $54,103 during the period November 1, 1971, through December 31, 1971, and reported such loss on its Federal income tax return for the same period. Pursuant to section 172, $2,092 of this net operating loss was carried back to petitioner's fiscal year ended October 31, 1971, leaving $52,011 to be carried forward. This loss was generated by member and nonmember business in petitioner's grain and farm supply operations in the following amounts:

| Operation | Member | Nonmember |
|-----------|--------|-----------|
| Grain | $137 | $242 |
| Supply | (29,338) | (23,052) |

Respondent has calculated that 6 percent of the member supply loss is allocable to cooperative members who terminated their membership after the loss period.

Petitioner incurred a net operating loss of $88,281 for the calendar year 1972 and reported this amount on its Federal income tax return for that year. This loss was generated by member and nonmember business in petitioner's grain and farm supply operations in the following amounts:

| Operation | Member | Nonmember |
|---|---|---|
| Grain | ($5,107) | ($8,136) |
| Supply | | |
| Petroleum | 47,108 | 27,348 |
| Fertilizer | (83,458) | (75,557) |
| Feed | 201 | 139 |
| Store | 2,456 | 6,725 |

Respondent has calculated that 18 percent of the member grain loss and 10 percent of the member supply loss were allocable to members who terminated their membership after the loss year.

Although during the relevant periods some members terminated their membership, a substantial majority continued doing business with their cooperative. Eight of the 12 Ford County members who sold or stored grain (74 percent of its member grain business) and 146 of the 158 members who purchased agricultural supplies (97 percent of its member supply business) during the period January 1, 1971, through January 31, 1971, continued selling and storing grain or buying supplies during 1973. Nine hundred and eleven of petitioner's 1,040 members who purchased agricultural supplies during the period November 1, 1971, through December 31, 1971 (94 percent of its member supply business), continued to purchase supplies during 1973. Eighty-nine of petitioner's 114 members who sold grain to or stored grain with it (82 percent of its member grain business) and 1,295 of its 1,669 members who purchased agricultural supplies from it (90 percent of its member supply business) in the calendar year 1972 continued selling and storing grain or buying supplies during 1973.

Many members who did grain business with their cooperative also bought farm supplies from it. Three of the 12 Ford County members who sold grain to or stored grain with it during the period January 1, 1971, through January 31, 1971, also purchased agricultural supplies from it during the same period. Thirty-seven of 76 members, 94 of 114 members, and 97 of 118 members of petitioner who sold grain to or stored grain with it during the periods November 1, 1971, through December 31, 1971, calendar year 1972 and calendar year 1973, respectively, also purchased agricultural supplies from petitioner during those particular periods. The winter months, November through January, are generally poor for farm supply sales.

The articles of incorporation and the bylaws of Ford County

and petitioner are silent on the treatment of cooperative losses; however, each grants complete control and management to the board of directors. The individual contracts entered into by Ford County and petitioner with members for the purchase of grain or the sale of farm supplies contained no provisions for later assessment of losses by adjustments to the price paid for grain or the price charged for supplies. The manager and board of directors of Ford County and petitioner had frequent and continuing formal and informal contacts with their members during which the losses at issue were discussed, and at no time did the members suggest that such losses be assessed back to them.

On its 1973 Federal income tax return, the petitioner deducted net operating losses including the following which are at issue in this case: (1) $24,639 from Ford County's final Federal income tax return for the period January 1, 1971, through January 31, 1971, (2) $52,011 of the $54,103 from its Federal income tax return for the period November 1, 1971, through December 31, 1971, and (3) $88,281 from its 1972 Federal income tax return. Respondent disallowed the claimed net operating loss carry-overs.

## OPINION

Petitioner, a cooperative,[3] incurred net operating losses in

---

[3]A definition of a cooperative is an association which furnishes an economic service without entrepreneur profit and which is owned and controlled on a substantially equal basis by those for whom the association is rendering service. I. Packel, Law of Cooperatives 2 (3d ed. M. Bender 1956). The definition is of value as a matter of clarification but should not be used for substantive exclusion or for limitation of analysis. "[N]o one plan of organization is to be labeled as truly co-operative to the exclusion of others." *Frost v. Corporation Commission,* 278 U.S. 515, 546 (1929). Commonly, a cooperative has the following attributes:

(1) control and ownership of each member is substantially equal;

(2) members are limited to those who will avail themselves of the services furnished by the association;

(3) transfer of ownership interests is prohibited or limited;

(4) captial investment receives either no return or a limited return;

(5) economic benefits pass to the members on a substantially equal basis or on the basis of their patronage of the association;

(6) members are not personally liable for obligations of the association in the absence of a direct undertaking or authorization by them;

(7) death, bankruptcy, or withdrawal of one or more members, does not terminate the association; and

(8) services of the association are furnished primarily for the use of the members.

[I. Packel, Law of Cooperatives, *supra* at 3-4.]

1971 and 1972 which were carried over and deducted from gross income in 1973. These losses arose in two general areas of operations, namely, the marketing and storage of grain and the sales of farm supplies. Some of the patrons who were members of petitioner and whose business contributed to the losses during 1971 and 1972 had terminated their memberships before 1973.

Respondent has conceded that a cooperative can sustain net operating losses, that the carryover deduction provisions of section 172 are available to cooperatives, and that a net operating loss from nonmember business may be carried back or forward to offset nonmember income (see, e.g., Rev. Rul. 74–377, 1974–2 C.B. 274).[4] He argues, however, that a cooperative's right to avail itself of section 172 for losses incurred in business operations with cooperative members is restricted by what are, in his view, certain fundamental principles of cooperative operation, in particular the concepts of equitable allocation and operation at cost. Just as a cooperative must return earnings to the group of patrons whose business produced those earnings, respondent reasons that the cooperative must therefore return losses to the patrons whose business produced those losses. Thus, respondent maintains that a net operating loss may only be carried over to offset income in other years of the same members whose business produced the losses. Moreover, to the extent the loss is attributable to business conducted with or on behalf of members who terminate their membership, it is respondent's view that the loss must be recovered currently.[5]

The concept of equitable allocation as it relates to the taxation of cooperatives is not novel. Prior to the enactment of subchapter T, distributions denominated "patronage dividends" had to meet certain requirements to be deductible. The judicial tests for deductibility were: (1) The allocation must be made pursuant to a legal obligation which existed at the time the participating patrons transacted their business with the cooperative; (2) the

---

[4]This means that of the $164,931 net operating loss deduction for 1973 in dispute, petitioner is entitled to deduct at least $84,492 of nonmember losses against nonmember income.

[5]Respondent suggests that this be done by an offset to the capital account of the departing member. We assume this means (1) application of the loss against outstanding credits which are due to the departing member, (2) direct assessment, or (3) accrual of an accounts receivable. See generally G. Holmes, "Cooperatives and Losses: An Historical Perspective on Current Issues," 28 The Cooperative Accountant 2, 5 (Winter 1975).

allocation must be made out of profits or income realized from transactions with the particular patrons for whose benefit the allocation was made; and (3) the allocation of earnings must be made *equitably;* that is, ratably to the particular patrons whose patronage created the income from which the allocated fund was made. *Union Equity Cooperative Exchange v. Commissioner,* 58 T.C. 397, 403 (1972), affd. 481 F.2d 812 (10th Cir. 1973). See also *Smith & Wiggins Gin, Inc. v. Commissioner,* 37 T.C. 861 (1962), affd. 341 F.2d 341, 350 (5th Cir. 1965); *United States v. Mississippi Chemical Co.,* 326 F.2d 569, 573–574 (5th Cir. 1964). Since the enactment of subchapter T in 1962, section 1388(a) now sets forth the statutory standard for testing patronage dividends.[6]

The concept of operation at cost simply means that a cooperative was organized for the purpose of rendering economic services, without gain to itself, to shareholders or to members who own and control it. *United Grocers, Ltd. v. United States,* 186 F. Supp. 724, 733 (N.D. Cal. 1960).

Extrapolating from these two principles of equitable allocation and operation at cost, respondent contends that (1) grain operation losses for the periods in question should be carried forward to a profitable year to offset grain income attributable to members engaged in grain transactions with the cooperative, rather than offsetting supply operations income in 1973, and (2) grain and supply operation losses allocable to since-terminated members should be recovered currently from those particular members instead of carrying forward and deducting such losses.

Regarding the contention that grain operation losses in 1971 and 1972 cannot be used by petitioner to offset farm supply operations income in 1973, respondent errs in two respects. First,

---

[6]SEC. 1388. DEFINITIONS; SPECIAL RULES.

(a) PATRONAGE DIVIDEND.—For purposes of this subchapter, the term "patronage dividend" means an amount paid to a patron by an organization to which part I of this subchapter applies—

(1) on the basis of quantity or value of business done with or for such patron,

(2) under an obligation of such organization to pay such amount, which obligation existed before the organization received the amount so paid, and

(3) which is determined by reference to the net earnings of the organization from business done with or for its patrons.

Such term does not include any amount paid to a patron to the extent that (A) such amount is out of earnings other than from business done with or for patrons, or (B) such amount is out of earnings from business done with or for other patrons to whom no amounts are paid, or to whom smaller amounts are paid, with respect to substantially identical transactions.

although the two operations are clearly different, we have found as a factual matter that there is a substantial overlap of patronage business between them: 48 percent (37 out of 76), 82 percent (94 out of 114), and 82 percent (97 out of 118) of petitioner's members who sold grain to or stored grain with it during the periods November 1, 1971, through December 31, 1971, calendar year 1972 and calendar year 1973, respectively, also purchased agricultural supplies during those particular periods. Only 25 percent (3 out of 12) of Ford County members who sold grain to or stored grain with it during January 1971 also purchased agricultural supplies from it during the same period. But we think the 1 month statistic is atypically low not only because of the short time period involved but also because the sample is taken from a period of traditionally low farm supply sales. Thus, we think a yearly figure for overlapping sales would be significantly higher. The managers and boards of directors of Ford County and petitioner had frequent and continuing formal and informal contacts with their members, during which the members never suggested that the cooperative charge or assess its members for the amounts of the losses. The members also received annual financial reports. Presumably, the membership was aware of the allocations used by Ford County and petitioner and found them acceptable, as petitioner must have when Ford County was merged into it. Under these circumstances, we think petitioner's method of allocation reaches a practicable, nondiscriminatory, and equitable result.[7] *Juniata Farmers Cooperative Association v. Commissioner*, 43 T.C. 836, 840 (1965). See also Rev. Rul. 67–128, 1967–1 C.B. 147.

Second, and most important, respondent has not cited any judicial or statutory authority, nor are we aware of any, applying the concept of equitable allocation to the deductibility of net operating losses. The cases on which respondent relies hold that a cooperative may not distribute patronage income from marketing activities to supply patrons, or vice versa, and be entitled to a patronage dividend deduction. See sec. 1388(a)(3). Such cases have no application to the deductibility of

---

[7]We note that respondent has not attacked the method of allocation used by the cooperative for the various subgroups of items within the farm supply category. For instance, in 1972 members buying fertilizer generated an $83,458 loss while members buying petroleum generated a $47,108 profit margin.

net operating losses. When Congress enacted subchapter T, it created a detailed statutory framework for the taxation of cooperatives.[8] We find no statutory restriction on the deduction of net operating losses by cooperatives as proposed by respondent either in subchapter T or section 172. The instant case presents a set of facts distinguishable from those in *Farm Service Cooperative v. Commissioner*, 619 F.2d 718 (8th Cir. 1980), revg. 70 T.C. 145 (1978), wherein the Circuit Court held that a nonexempt cooperative could not carry forward *patronage* losses to offset *nonpatronage* income. Here, petitioner is applying grain patronage losses against farm supply patronage income where there is a substantial overlap member business between the two operations and where the members, themselves, appear to find such an allocation fair. We find no impediment in the statute or the regulations to this action.

Respondent also argues that grain and supply losses allocable to terminated members must be recovered currently from them and cannot be carried forward and applied to patronage income from continuing members. This argument appears to be a refinement of his position in *Associated Milk Producers, Inc. v. Commissioner*, 68 T.C. 729 (1977). In that case he argued that, because of the "operation at cost" principle, a cooperative by its very nature could not have a net operating loss for tax purposes. In any year when expenses exceed income, the loss must be recovered from the members who were patrons for that period (i.e., the converse of a patronage dividend allocation when income exceeds expenses). In the instant case, respondent argues that while a cooperative may carry forward the loss allocated to continuing members, it cannot carry forward the loss allocated to terminated members. In *Associated Milk Producers*, the Commissioner sought to deny the net operating loss carryforward for all members, while here he would deny it only for terminated members. In rejecting his argument in *Associated Milk Producers*, we stated that his position was "not only contrary to the express provisions of section 172, but conceptually strained and lacking any fundamental policy support; in short, an unwarranted tinkering with the tax structure applicable to

---

[8]Pub. L. 87–834, sec. 17(a), 76 Stat. 1045 (1962).

cooperatives." 68 T.C. at 736. We think this characterization is equally applicable to respondent's arguments in this case.

The "operation at cost" principle describes a feature of a cooperative's relations with its members, not a codified requirement of tax accounting. Accordingly, we reject respondent's argument that the principle of "operation at cost" absolutely bars a cooperative from carrying forward and deducting losses allocable to its terminated members.

For the period January 1, 1971, through January 31, 1971, respondent calculated that 26 percent of Ford County's member grain loss and 3 percent of its members supply loss were allocable to cooperative members who terminated after the loss period. For the period November 1, 1971, through December 31, 1971, respondent calculated that 6 percent of petitioner's number supply loss was allocable to terminated members and for the calendar year 1972, the figures are 18 percent of member grain loss and 10 percent of member supply loss. Despite these statistics, a substantial majority of cooperative members continued doing business with the cooperative.

The allocation of losses among a cooperative's past, continuing, and future members is properly the concern of the membership and its board of directors. The articles of incorporation and the bylaws of Ford County and petitioner are silent on the treatment of cooperative losses; however, each grants complete control and management to the board of directors. Petitioner chose to carry forward the net operating losses rather than attempt to recover such amounts from terminated members. This was a business judgment. The individual contracts entered into by Ford County and petitioner with their members for the purchase of grain or sale of farm supplies contained no provisions for later assessment of losses by adjustments to the price paid for grain or the price charged for supplies. We also note that the State statutes under which Ford County and petitioner were organized appear to prohibit assessment of losses back to members.[9]

---

[9] Sec. 454.3, Agricultural Co-Operative Act of Illinois, Ill. Ann. Stat. ch. 32, sec. 454.3 (Smith-Hurd), provides as follows:

"No member shall be liable for the debts of the association to an amount exceeding the sum remaining unpaid on his membership fee or his subscription to the capital stock, including any unpaid balance on any promissory notes given in payment thereof."

Sec. 102(b)(6) General Corporation Law of the State of Delaware, Del. Code Ann. tit. 8, sec.

Given the relevant articles of incorporation and bylaws, the considered business judgment of the board of directors, the apparent approval of the members, the actual allocations, and the language of the State law concerning cooperative member-debt liability, we hold that the petitioner is entitled to carry forward that part of its grain and farm supply losses allocable to terminated members. *Associated Milk Producers, Inc. v. Commissioner*, 68 T.C. 729 (1977).

To reflect the concessions of the parties and our conclusions with respect to the disputed issues,

*Decision will be entered under Rule 155.*

---

102(b)(6), provides that, absent a provision in the articles and bylaws to the contrary:

"the stockholders or members of a corporation shall not be personally liable for the payment of the corporation's debts except as they may be liable by reason of their own conduct or acts;"

Sec. 8533, Delaware Code, concerning agricultural cooperatives, Del. Code Ann. tit. 3, sec. 8533, provides:

."The officers and stockholders of an association organized under and accepting the provisions of this chapter, shall not be individually liable for the debts of the association otherwise than as provided in this chapter. Each common stockholder of an association shall be liable in his individual capacity to the amount of stock held by him for all work and labor done to carry on the operations of the association. * * * "

See also *Elliott v. Adeckes*, 59 N.W.2d 894 (Minn. 1953), holding that patrons were not liable to a bankruptcy trustee for deficits of their cooperative; Minn. Stat. Ann. sec. 300.27 (West 1969), providing, among other things, that no stockholder of a cooperative shall be liable for any debt of the cooperative.