**BUCKEYE POWER, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 93–145T.

United States Court of Federal Claims.

May 28, 1997.

1986 U.S.C.C.A.N. 6344.

William R. Stewart, Cleveland, OH, for plaintiff. Thomas J. Callahan. David J. Hooker, and Robert P. Mone, Thompson Hine & Flony P.L.L., of counsel.

W.C. Rapp, Washington, DC, with whom was Assistant Attorney General Loretta C. Argrett, for defendant. Terry T. Coles, Assistant Chief, Court of Federal Claims Section, Tax Division, of counsel.

## OPINION

MILLER, Judge.

This case is before the court after argument on the parties' cross-motions for partial summary judgment. Buckeye Power, Inc. ("Buckeye" or "plaintiff"), a rural electric cooperative, sues for the refund of income tax paid for tax years 1982, 1984, and 1987. Plaintiff takes the position that 85% or more of its income was derived from amounts collected from members for the sole purpose of meeting losses and expenses, thus warranting tax-exempt treatment pursuant to 26 U.S.C. ("I.R.C.") § 501(a), (c)(12) (1994).

## FACTS

The parties agreed to a comprehensive stipulation of facts, and other facts also appear without controversy.

### 1. *Buckeye and its members*

Plaintiff was incorporated in 1949 by a group of rural electric cooperatives as a rural electric cooperative organized and operating under the nonprofit corporation law of the State of Ohio. In 1968 plaintiff began generating and selling power to its member cooperatives.

During the years at issue in this case, 1982 through 1987, plaintiff had 29 members—28 rural electric cooperatives operating in Ohio and Buckeye Member Cooperative, Inc. ("Buckeye Member"). Buckeye Member was formed in 1979 by the 28 other members of Buckeye and by American Municipal Power–Ohio, Inc. ("AMP–Ohio").[1] Plaintiff's members, except for Buckeye Member, purchased electricity from plaintiff and resold the electricity to individuals; non-profit corporations; federal, state, and local entities; and businesses that consume electrical power. Buckeye Member purchased electricity from plaintiff and resold the power to AMP–Ohio.

The relationship between plaintiff and its respective members was governed by an agreement entitled the "Wholesale Power Agreement." Pursuant to the Wholesale Power Agreement, plaintiff served as the exclusive wholesale supplier of electricity to its members. From 1982 through 1987, plaintiff sold "firm" and "non-firm" power to its members.[2] Firm power is defined in the electrical generation industry as power that the supplier of the power must supply continuously and that it has no right to interrupt. Non-firm power is defined in the electrical generation industry as power that the supplier may interrupt or stop the flow thereof at its discretion.

The price plaintiff charged its members for electricity consisted of three components: a fuel charge, an energy charge, and a demand charge. The fuel charge was based on the cost of fuel consumed in the production of electricity. The energy charge was based on other variable costs of producing electricity, such as maintaining the facilities. The demand charge was based on the fixed costs of maintaining capacity to generate electricity.

The demand charge component of the price varied depending on whether the member was purchasing firm or non-firm power. Members purchasing firm power paid a full demand charge for the right to draw electricity at any time. Members purchasing non-firm power paid a substantially discounted demand charge in most instances.[3] Members purchasing non-firm power, however, did not receive the discounted demand charge rate if they continued to draw non-firm power at any time when the generating system producing the power was at its peak demand.[4]

Because plaintiff sold off-peak non-firm power at a discount, the amount received by plaintiff for such power was less than plaintiff's fully distributed cost. As a result, plaintiff's sale of non-firm power did not yield a margin from which a patronage dividend could be allocated to members purchasing non-firm power.

### 2. *The generation of power at Cardinal Station*

The power that plaintiff sold to its members was generated at the Cardinal Station, located near Brilliant, Ohio. The Cardinal Station consisted of three coal-fired electrical generating units, known, respectively, as Unit 1, Unit 2, and Unit 3. The Ohio Power Company ("Ohio Power"), a subsidiary of the American Electric Power Company, Inc., owned Unit 1, and plaintiff owned Units 2 and 3. Plaintiff and Ohio Power formed the

---

1. AMP-Ohio was formed by a number of Ohio municipal electric systems for the purpose of developing power supply and interchange agreements. Neither AMP–Ohio nor any of its members is a member of Buckeye.

2. During this period 14 of plaintiff's members, including Buckeye Member, purchased non-firm power. Buckeye Member only purchased non-firm power.

3. Plaintiff's average rate for off-peak non-firm power was more than 20% lower than the average rate per kilowatt hour for electricity purchased under plaintiff's firm power rate schedules.

4. Plaintiff's peak demand was defined as the maximum kilowatt demand ever recorded at the Cardinal Station high-voltage busses, as adjusted for transmission losses, for electricity demanded by the members of Buckeye.

Cardinal Operating Company ("Cardinal") to manage the day-to-day operations of Cardinal Station. Cardinal was responsible for the daily operation of all three units. Plaintiff and Ohio Power each owned one half of Cardinal's common stock. During the years at issue, Cardinal had no net profit or loss from its operations because its annual income was equivalent to the expenses incurred in the operation and maintenance of Cardinal Station.

Plaintiff and Ohio Power's rights to the electricity produced at Cardinal Station were set forth in a document called the "Cardinal Station Agreement." Ohio Power was entitled to all of the electricity generated by Unit 1, and plaintiff was entitled to that amount of electricity generated by Units 2 and 3 necessary to meet the requirements of its members. If Units 2 and 3 produced more electricity than plaintiff needed to meet the requirements of its members, Ohio Power had the right to consume such excess electricity.

In addition to defining plaintiffs and Ohio Power's rights to the electricity generated at Cardinal Station, the Cardinal Station Agreement also defined the parties' respective liabilities for the expenses incurred by Cardinal Station. The relevant expenses included ownership expenses (including debt service, taxes, and insurance), fuel and maintenance expenses, and operating expenses other than fuel and maintenance. The Cardinal Station Agreement stated that Ohio Power was responsible for the ownership expenses for Unit 1, and plaintiff was responsible for the ownership expenses of Units 2 and 3. The fuel and maintenance expenses were allocated between plaintiff and Ohio power based on their consumption of electricity. With regard to all other operating costs incurred by Cardinal Station, plaintiff was responsible for those costs attributable to 115% of the capacity of Units 2 and 3 used by plaintiff to meet the peak demand of its members. Ohio Power was responsible for the balance of all other operating costs.

Cardinal provided plaintiff and Ohio Power with a monthly invoice explaining each corporation's liabilities, as set out in the Cardinal Station Agreement, for the costs of operating Cardinal Station. Upon receiving the invoice, plaintiff and Ohio Power remitted their shares of the expenses directly to Cardinal. In addition to paying its allocated percentage of the operating costs to Cardinal, Ohio Power also paid plaintiff a monthly "banked capacity charge" as a fee for the use of the excess capacity from Units 2 and 3. Ohio Power paid plaintiff banked capacity charges in the amounts of $9,614,494.00, $8,085,309.00, and $6,848,803.00 for plaintiff's fiscal years ended June 30, 1982, 1984, and 1987, respectively.

### 3. Plaintiff's Forms 990 and the IRS audit

Plaintiff filed its application for tax-exempt status pursuant to 26 I.R.C. § 501(c)(12) with the Internal Revenue Service (the "IRS") on or about March 30, 1974. The IRS notified plaintiff that it meet the requirements for tax-exempt status by letter dated May 31, 1974. In 1977 the IRS audited plaintiff's Form 990 for the fiscal year ended June 30, 1975, and concluded that plaintiff continued to meet the requirements for tax-exemption. In 1981 the IRS audited plaintiff's Form 990 for the fiscal year ended June 30, 1979, and once again confirmed plaintiff's status as a tax-exempt organization.

In 1983 the IRS began an audit that ultimately encompassed plaintiff's Forms 990 for its fiscal years ended June 30, 1982–87.[5] The IRS concluded that plaintiff's membership income for fiscal years 1982, 1984, and 1987 constituted less than 85% of plaintiff's total income. This conclusion was based on the IRS's finding that 1) plaintiff improperly reported income from sales of non-firm power to its members as membership income, and 2) plaintiff improperly excluded payments made by Ohio Power to Cardinal from its income. The IRS therefore retroactively revoked plaintiff's tax-exempt status for 1982, 1984, and 1987.

The IRS proposed assessments of tax, exclusive of interest, in the following amounts: $529,085.00 for 1982; $13,838.00 for 1984; and $160,863.00 for 1987. Plaintiff subse-

---

**5.** The IRS's District Director at Cincinnati, Ohio, did not complete the audit until 1989.

quently paid the proposed tax deficiencies and interest: $1,190,501.00 for 1982; $23,779.00 for 1984; and $202,624.00 for 1987. On November 8, 1991, plaintiff filed Claims for Refund for fiscal years 1982, 1984, and 1987. The IRS denied plaintiff's Claims for Refund on February 4, 1993, and plaintiff filed suit in this court on March 12, 1993. Plaintiff's complaint contained 11 counts. Counts 1 through 4 alleged that plaintiff was entitled to a refund because it was a tax-exempt organization. Counts 5 through 11 alleged, in the alternative, that the amount of tax assessed by the IRS was erroneous. The parties' cross-motions for summary judgment now before the court seek judgment as a matter of law only on the issue of plaintiff's tax-exempt status.

## DISCUSSION

### 1. *Summary judgment standard*

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Seal–Flex, Inc. v. Athletic Track and Court Constr.,* 98 F.3d 1318, 1321 (Fed.Cir.1996) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986)). The moving party bears the initial burden of establishing the absence of any disputes of material fact. *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). "When the movant has met its initial burden, the non-movant must respond with sufficient evidence to show that there is a material factual dispute and that, on the non-movant's evidence, the movant is not entitled to judgment as a matter of law." *Id.* The Supreme Court has emphasized that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action....'" *Celotex,*

477 U.S. at 327, 106 S.Ct. at 2555 (citation omitted).

Both plaintiff and defendant, as the moving parties, have the burden of establishing that no genuine disputes of material fact are present and that the movant is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53. "Summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987) (citation omitted).

### 2. *I.R.C. 501(c)(12)(A) and tax-exempt cooperatives*

I.R.C. § 501(a) provides that "[a]n organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503." Section 501(c)(12)(A) lists several types of organizations that fall within the purview of section 501(a):

> Benevolent life insurance associations of a purely local character, mutual ditch or Irrigation companies, mutual or cooperative telephone companies, or like organizations; but only if 85 percent or more of the income consists of amounts collected from members for the sole purpose of meeting losses and expenses.

The IRS has ruled that a rural electric cooperative can qualify as an exempt organization pursuant to I.R.C. 501(c)(12)(A) provided that the cooperative satisfies the 85% test. Rev. Rul. 67–265, 1967–2 C.B. 205.

### 3. *The disputed issues*

Defendant presents three reasons for concluding that plaintiff failed to satisfy the 85% test of I.R.C. § 501(c)(12).[6] First, defendant

---

**6.** Although plaintiff and defendant, as cross-movants, each bear the burden of proving an absence of genuine issues of material fact and an entitlement to judgment as a matter of law, the court frames the issues from defendant's perspective solely for the sake of clarity. Plaintiff scrupu-

lously has been held to its burden to establish that it has overpaid its taxes for the period in issue and the exact amount of overpayment. *See Lewis v. Reynolds,* 284 U.S. 281, 52 S.Ct. 145, 76 L.Ed. 293 (1932); *Missouri Pac. R.R. v. United*

argues that the income from plaintiff's sale of non-firm power to its members was not cooperative in nature and thus did not qualify as member income. Second, defendant argues that income from plaintiff's sale of non-firm power to Buckeye Member did not constitute member income because Buckeye Member was a sham corporation. Third, defendant argues that Ohio Power's payments to Cardinal for the variable costs of generating power should be viewed as payments to plaintiff and counted as non-member income. The court addresses each of defendant's arguments in turn.

### a. The sale of non-firm power

Defendant contends that plaintiff's discounting of the demand charge for non-firm power was not cooperative in nature, and therefore the income from sales of non-firm power did not constitute member income. Defendant premises its argument on the notion that a cooperative must conduct all transactions with its members "at cost." Def's Br. filed Nov. 6, 1996, at 4. According to defendant, when plaintiff sold non-firm power at a discounted demand charge, plaintiff was not attempting to recover the cost of generating the non-firm power. Instead, plaintiff was selling excess power to defray the costs of generating firm power. Plaintiff counters that it discounted the demand charge for non-firm power to reflect the reduced level of service that it provided to non-firm customers, not to subsidize the sale of firm power.

The instant dispute highlights the uniqueness of I.R.C. § 501(c)(12). Unlike other provisions of the Internal Revenue Code that specifically prescribe how an entity must conduct itself in order to take advantage of a statutory benefit, I.R.C. § 501(c)(12) has only one requirement—that 85% of the organization's income come from members for the sole purpose of meeting losses and expenses. The statute does not provide guidance on the question now before the court, namely, whether, in order to count towards the 85% requirement, a cooperative must allocate its fixed costs in a specific manner.

States, 168 Ct.Cl. 86, 89–91, 338 F.2d 668. 670–71 (1964).

Although conceding that I.R.C. § 501(c)(12) does not contain an express allocation requirement, defendant argues that the "at cost" principle inheres in the definition of a cooperative. In *Columbus Fruit and Vegetable Coop. Ass'n v. United States,* 7 Cl.Ct. 561 (1985), the Claims Court [7] defined the term cooperative, as follows:

> A cooperative is an organization established for the purpose of purchasing and marketing the products of its members, i.e., shareholders, and/or procuring supplies for resale to the members, whose profits are distributed to the members (in the form of patronage dividends), not on the basis of the members' equity investment in the cooperative, but in proportion to their patronage of it, i.e., the amount of business that each member transacts with it.

*Id.* at 563 (footnote omitted); *see Ford–Iroquois FS, Inc. v. Commissioner,* 74 T.C. 1213, 1217 n. 3, 1980 WL 4484 (1980) (containing similar definition of cooperative); *Puget Sound Plywood, Inc. v. Commissioner,* 44 T.C. 305, 308, 1965 WL 1164 (1965) (discussing founding principles of Rochdale Society of Equitable Pioneers); *Farmers Coop. Co. v. Birmingham,* 86 F.Supp. 201 (N.D.Iowa 1949).

Based on this definition, defendant argues that all cooperatives must transact business with their members with the intent of recovering their costs. Failure to recover costs, while certainly not illegal, reflects an entrepreneurial, rather than a cooperative, orientation. During argument defense counsel presented a hypothetical to illustrate its position:

> [W]e all know that the white line in the middle of the highway of thinking about cooperatives is that a bunch of guys got together and said, gosh. I'll bet we can get rakes cheaper if we all buy a carload of them rather than everybody going to buy one. How many rakes does everybody need?

**7.** The erstwhile United States Claims Court was renamed the United States Court of Federal Claims.

And we figured out, we buy a carload from the manufacturer and, of course, it's cheaper. And we split up the costs because we had to send some guy down and he had gas money to pick them up and all that. And we split it all out and we're better off. That's the white line on the middle of the annals of the highway of understanding what a cooperative is about.

And as soon as you start deviating from that and instead of gosh, Bob. How many rakes do we all need this week or this year, you go over and say, you know, this rake business looks good. There are a bunch of people who could use rakes. Why don't we buy a bunch more rakes than we need and we'll just sell them?

Well, there's nothing illegal about that. That's wonderful. But it's not cooperative. It's not what a cooperative is supposed to be about.

Transcript of Proceedings, *Buckeye Power, Inc. v. United States*, No. 93–145T, at 36–38 (Fed.Cl. May 5, 1997) (hereinafter "Tr.").

Defendant compares plaintiff's sale of non-firm power to the hypothetical cooperative's sale of excess rakes:[8]

Buckeye presumably makes off-peak electricity sales at a price below cost because doing so is preferable (in the economic sense) to no sales at all, and enable Buckeye to offset at least some of its expenses, such as capital costs, that would otherwise be borne by the sales of on-peak electricity to its other members. It is for this reason, however, that it must be concluded that the sales are not cooperative in nature. Buckeye is not selling electricity to a member with the intent of receiving from such member a sufficient price to cover the cost of producing the electricity. *Rather, Buckeye is selling electricity to a member at a price clearly below cost, solely for the propose of reducing the cost of producing on-peak electricity which is sold to Buckeye's other members.* Thus, Buckeye is selling such off-peak electricity for its own account. That is, Buckeye's intent is to derive an economic benefit from the sale of electricity (i.e., to generate revenue that would otherwise not be generated so as to reduce its other costs), rather than to produce and distribute its product to its members, and have them share the costs on a cooperative basis.

8. In another attempt to show that plaintiff's sale of non-firm power with a discounted demand charge was non-cooperative, defendant points to the fact that the sale of non-firm power did not produce a margin from which a patronage dividend could be distributed. Defendant, however, did not explain the legal significance of this fact.

The Tax Court has explained that a cooperative must distribute patronage dividends "on a substantially equal basis or on the basis of their [the members'] patronage of the association." *Ford–Iroquois*, 74 T.C. at 1217 n. 3. The record in this case indicates that plaintiff's distribution of patronage dividends only to its firm power customers was made on the basis of patronage. Defendant and plaintiff stipulated that non-firm power customers did not receive patronage dividends because "Buckeye's rate schedules for the sale to its members (including Buckeye Member) of non-firm power resulted in sale of such power at less than Buckeye's fully distributed cost." Joint Stipulation of Fact filed June 27, 1996, at ¶ 23. The non-firm customers paid less than plaintiff's fully distributed cost, and thus their transactions with plaintiff did not generate a margin entitling them to a patronage dividend.

The Ninth Circuit has counseled that how a cooperative distributes patronage dividends is for the members of the cooperative, and not the IRS, to decide. *See Peninsula Light Co. v. United States*, 552 F.2d 878 (9th Cir.1977). In that case a local government entity took by eminent domain part of an electric cooperative's generation system. As a result of the eminent domain action. certain of plaintiff's members were no longer in plaintiff's service region and thus ended their membership. The local government compensated plaintiff for the taking of its generation system. The IRS objected to the fact that the cooperative did not distribute the proceeds paid by the local government to the former members. Rejecting the IRS's claims of unfair treatment, the Ninth Circuit stated:

> We, as an appellate court, are not here to decide what is the most "fair" for the members of Peninsula and we seriously question whether that is properly within the province of the IRS either. We sit only to decide whether Peninsula is a tax-exempt mutual organization. Even assuming that Peninsula's system is unfair to some members, it is the members themselves, utilizing their equal voting power, who should change it, if that is their wish and if they can muster the strength.

*Id.* at 881–82 (citation omitted) (footnote omitted). Although the court considers the Ninth Circuit's position to be cavalier, given that the distribution of patronage dividends is integral to a cooperative, plaintiff's point is that it distributed patronage dividends rationally, in that the sale of firm power produced a sufficient margin for a dividend, whereas non-firm sales did not.

Def's Br. filed Nov. 6, 1996, at 20 (emphasis added).

The court agrees with defendant that an organization that purchases more products than its members require with the intent of selling the excess in order to defray the members' fixed costs may not fall within the definition of a cooperative. However, the record does not support defendant's contention that plaintiff sold non-firm power "solely for the purpose of reducing the cost of producing on-peak electricity which is sold to Buckeye's other members." *Id.* When plaintiff agreed to sell firm power to its members, plaintiff guaranteed that it would provide the members with an uninterrupted supply of power. This guarantee provided the firm power customers with preferred access to plaintiff's capacity. In return for preferred access to plaintiff's capacity, the firm power customers paid a full demand charge "which was sufficient to cover all of the fixed costs of maintaining the capacity of Cardinal Units 2 and 3." Plf's Supplemental Proposed Findings of Fact filed Feb, 12, 1997, at ¶ 1. At certain times the firm power customers did not demand all of plaintiff's capacity, leaving plaintiff with excess power. Plaintiff sold the excess power to its non-firm customers with the understanding that the power would be available only after plaintiff satisfied the requirements of its firm power customers. Because plaintiff did not guarantee the non-firm power customers an uninterrupted supply of power, plaintiff discounted their demand charge. Nothing in the record countermands a finding that plaintiff sold power on a basis inconsistent with that understanding.

Defendant's rake cooperative sold its excess rakes at a discount simply to recoup some of its fixed costs, so as to generate additional income. Plaintiff, on the other hand, sold excess power at a discount because it could not provide non-firm customers with the same level of service as its firm power customers. Consequently, defendant's attempt to portray plaintiff's pricing structure as non-cooperative is not persuasive. As the Tax Court explained in *Ford–Iroquois*, "The concept of operation at cost simply means that a cooperative was organized for the purpose of rendering economic services, without gain to itself, to shareholders or to members who own and control it." 74 T.C. at 1219 (citing *United Grocers, Ltd. v. United States*, 186 F.Supp. 724, 733 (N.D.Cal.1960), *aff'd*, 308 F.2d 634 (9th Cir. 1962)). This definition does not preclude a cooperative from charging members different prices for different levels of service.

The IRS National Office recently published a Technical Advice Memorandum ("TAM") standing for the proposition that where a cooperative offers different services to different members the cooperative need not allocate all of its fixed costs evenly between the members. While the court cannot rely on the TAM as precedent, see I.R.C. § 6110(j)(3), the TAM provides a cohesive and logical discussion of the parameters of cooperative cost allocation, and, as plaintiff urges, shows the strength of its evidentiary position.[9]

The TAM taxpayer was a generation and transmission electric cooperative that had three classes of members, Classes A–C. Class A members purchased primarily firm power, while Class B and C members purchased primarily non-firm power. The TAM taxpayer charged Class A members a higher demand charge than Class B and C members. The IRS District Director argued that the TAM taxpayer purposely built a generating facility with more capacity than it needed so that it could sell the excess power and subsidize the Class A members's costs. The IRS National Office, while respecting the District Director's general reason for concern, rejected the District Director's conclusion:

> The Service has been justifiably concerned about the practice of selling power to some members at a price below cost in an effort to produce a subsidy for other members. However, [the TAM taxpayer's] operations are clearly distinguishable from the situation where sales to some members are reduced below cost to offset the costs of other members. Electricity sales are growing among Class A members each year, and as they do, sales from [the TAM Taxpayer's] power plants to B and C members are reduced. It has historically been regarded as cost-effective for utilities to

9. In the absence of the TAM, the court would reach the same result. Plaintiffs briefs provide essentially the same justifications for discounting non-firm power as does the TAM.

build plants with greater generating capacities than they can presently themselves use, because in the long term, their customers/members will grow and eventually absorb that capacity.

. . . .

It is inappropriate to assume that all power costs the same per unit to produce and deliver. The members of the various classes are not merely purchasing kilowatt hours but rather the right to have a particular level of service. One must consider the facilities used, the source of power and the type of service provided. The Service has long recognized the differing costs associated with different service levels in a cooperative. [The TAM taxpayer] provides several different levels of service to its members and each level of service has different cost components which are affected by the level, time, delivery point, and reliability of service provided. Class A members have access to capacity and facilities that are not available to Class B and C members. *It follows then that all fixed costs associated with the production and delivery of power need not be spread among all members. Consequently, the price levels differ as a result of the fact that differing levels of service are purchased by the A members than the B or C members rather than as part of an effort to reduce the costs to the A members.*

Accordingly, absent any showing of any cross-class subsidization, we conclude that in this case electricity is being produced on a nonprofit basis for members who have agreed to share the costs of production. Accordingly, the organization is receiving

income from members in transactions which are legally and economically cooperative. It follows that Class B and C members are to be considered "members" for purposes of section 501(c)(12).

Technical Advice Memorandum, Oct. 24, 1996, at 7–9 (emphasis added).

The reasoning employed by the IRS National Office is consistent with a finding that plaintiff's transactions with its non-firm customers were cooperative. Plaintiff has established that, like the TAM taxpayer, it discounted the demand charge for non-firm power because non-firm customers did not have the same preferential access to plaintiff's capacity as did the firm power customers. Defendant does not dispute this fact.[10] Although defendant has a right to be concerned about a cooperative selling some of its products below cost to subsidize other sales, defendant has not come forward with any evidence disputing plaintiff's factual showing that it did not sell non-firm power to subsidize firm power. At oral argument defense counsel could not explain how plaintiff should have allocated its fixed costs: "I don't know what amount [of the demand charge] should be allocated [to non-firm power]." Tr. at 56. Given defendant's failure to either raise a genuine issue of fact concerning plaintiff's operations or to offer evidence that plaintiff discounted non-firm power to subsidize firm power, the court finds that plaintiff's sale of non-firm power constituted member income for purposes of I.R.C. § 501(c)(12).

b. *The status of Buckeye Member as a member of Buckeye*

Defendant argues that Buckeye Member was a sham corporation whose only purpose was to permit plaintiff to sell non-firm power to AMP–Ohio. If plaintiff had sold non-firm

---

**10.** In its Statement of Genuine Issues, defendant raised a partial objection to plaintiff's statement that firm and non-firm power are different products:

> To the extent that Mr. Kempfer [plaintiff's Vice President, Assistant Secretary and Assistant Treasurer] is using this formulation as a shorthand way of referring to the agreed definitions of what firm and non-firm power are (Stip. ¶ 15), as well as the agreed fact that Buckeye charges less for non-firm power (indeed, less than its cost of generation) than for firm power

(Stip. ¶ 23), then defendant has no objection. But to the extent Mr. Kempfer means that electricity sold at two prices constitutes two different products, in the sense that boots and shovels are two different products, then defendant objects that this constitutes a conclusion and an opinion which is unsupported by any explanation or analysis, and is therefore improper and should be rejected.

Def's Statement of Genuine Issues filed Nov. 6, 1996, at ¶ 10.

Defendant's disputed issue is not material to the case at bar. The parties stipulated that firm

power to AMP–Ohio directly, income from such sales would not have counted towards the 85% requirement. Defendant thus suggests that the court disregard Buckeye Member as an entity and view sales by plaintiff to Buckeye Member as sales by plaintiff to AMP–Ohio.

Taxpayers generally are free to choose the form of organization that best suits their operations. *See Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir.1934), *aff'd*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). At the same time, however, tax law focuses on the substance, rather than the form, of a transaction. *Holiday Village Shopping Ctr. v. United States*, 773 F.2d 276, 280 (Fed.Cir.1985); *see Halle v. Commissioner*, 83 F.3d 649, 655 (4th Cir.1996); *Dalton v. IRS*, 77 F.3d 1297, 1304 (10th Cir. 1996). In furtherance of this principle, the IRS has the power to challenge the form of a transaction motivated entirely by tax avoidance and lacking an independent business purpose. *See Higgins v. Smith*, 308 U.S. 473, 477–78, 60 S.Ct. 355, 357–58, 84 L.Ed. 406 (1940); *Lerman v. Commissioner*, 939 F.2d 44, 45 (3d Cir.1991). The Supreme Court has offered the following guidance concerning when the Government must respect a taxpayer's choice of form:

> [W]here, as here, there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties.

*Frank Lyon Co. v. United States*, 435 U.S. 561, 583–84, 98 S.Ct. 1291, 1303–04, 55 L.Ed.2d 550 (1978).

Buckeye Member was formed in 1979 by the 28 other members of Buckeye and by AMP–Ohio. Buckeye Member met the requirements of a member under Buckeye's Amended Articles of Incorporation and Code of Regulations, and the membership of Buckeye Member in Buckeye was approved by the Boards of Trustees of Buckeye and Buckeye Member in formal compliance with the requirements of their respective Codes of Regulations and Ohio law. During the 1982–87 fiscal years, Buckeye Member purchased only non-firm power from plaintiff.

Interestingly, the parties agree on the reason why Buckeye Member was created. "Buckeye Member ... was formed by the members of Buckeye to make off-peak non-firm power available for sale to American Municipal Power–Ohio ('AMP–Ohio') ...; to market this off-peak power, and to share the benefits of the sales of this off-peak power among all the members of Buckeye." Plf's Supplemental Proposed Findings of Fact filed Feb. 12, 1997, at ¶ 14. The parties, however, dispute whether this reason constitutes a legitimate business purpose.

Defendant focuses on the fact that Buckeye Member sold non-firm power exclusively to AMP–Ohio, which was not a member of Buckeye. The fact that Buckeye Member sold power to a non-member does not distinguish Buckeye Member from plaintiff's other members. Each of plaintiff's other 28 members also sold power purchased from plaintiff to non-members. Moreover, Buckeye Member's sales to AMP–Ohio were similar to sales made by other members of Buckeye. Prior to the formation of Buckeye Member, some of plaintiff's other members sold non-firm power to municipal systems, just as Buckeye Member did during the years in dispute.[11]

The record reveals that the 28 members of Buckeye and AMP–Ohio formed Buckeye Member for a legitimate business purpose—to market non-firm power as a group rather than individual entities. Defendant, having conducted extensive discovery, offers no evidence to support its contention that Buckeye Member was a sham corporation. Defendant appears to require plaintiff not only to demonstrate a legitimate business

---

power guarantees the customer an uninterrupted supply of power while non-firm power may be interrupted at the discretion of the supplier. *See* Joint Stipulation of Facts filed June 27, 1996, at ¶ 15. The court bases its finding on the stipulated distinction between firm and non-firm power. Whether the difference between firm and non-firm power is analogous to the difference between boots and shovels does not affect the outcome of this case.

11. As discussed *supra* note 1, AMP–Ohio was formed by a number of Ohio municipal electric

purpose for all of its transactions, but also to structure its operations in the manner that the IRS deems most appropriate. Although defendant may question transactions lacking a legitimate business purpose, "[a]ny one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose, that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes." *Gregory,* 69 F.2d at 810. The court thus finds that income from plaintiff's sale of non-firm power to Buckeye Member constituted member income for purposes of I.R.C. 501(c)(12).

### c. *Ohio Power's payment of variable costs to Cardinal*

Even though plaintiff owned Units 2 and 3, plaintiff, pursuant to the Cardinal Station Agreement, was only entitled to that amount of power needed to satisfy the requirements of its members. Ohio Power was entitled to the excess when plaintiff's members required less than the total capacity of Units 2 and 3. In return for the right to use plaintiff's excess capacity, Ohio Power paid plaintiff a monthly "banked capacity charge." Ohio Power also paid Cardinal for the variable costs attributable to the electricity it consumed.

Defendant contends that Ohio Power's payments to Cardinal relieved plaintiff of its obligation to pay for a portion of the variable costs incurred by Units 2 and 3 and thus constitute non-member income to plaintiff for purposes of I.R.C. 501(c)(12):

> Under the Station Agreement, Ohio Power pays at least a portion of the expenses of the Cardinal 2 and 3 generating units (owned by Buckeye) that relate to electricity produced for Buckeye and sold by Buckeye to Ohio Power. To the extent Ohio Power pays these expenses, Buckeye avoids expenses that it would otherwise incur, and therefore, realizes income. The net effect of the arrangement would not be different if Buckeye had charged Ohio Power a higher price for the electricity it sold to Ohio Power (which would result in a higher amount of nonmember income)

while paying expenses for the operation of the generating units.

Def's Br. filed Nov. 6, 1996, at 30–31.[12]

Plaintiff denies that it sold power to Ohio Power or that Ohio Power's payments to Cardinal constituted relief of an obligation. Instead, plaintiff compares the relationship between itself and Ohio Power to one between a landlord and a tenant:

> In the present case, Cardinal Units 2 and 3 are generating facilities owned by Buckeye. Buckeye was responsible for the fixed costs as owner. Buckeye as owner "rented" a portion of its *capacity* at Cardinal Units 2 and 3 to Ohio Power for the banked capacity payments (rent) made by Ohio Power to Buckeye, and Buckeye received banked capacity payments from Ohio Power in the amounts of $9,614,494, $8,085,309 and $6,848,803 for 1983, 1984 and 1987, respectively. Buckeye properly treated the banked capacity payments as nonmember income, and accordingly, they are not in issue in this case. Ohio Power paid its portion of the fuel, maintenance and other production costs (operating expenses). Since Buckeye was *not* obligated to pay such fuel, maintenance and other costs, it ... did not have taxable income because Ohio Power was paying its own expenses, not Buckeye's expenses.

Plf's Br. filed July 31, 1996, at 46–47.

Gross income for purposes of federal income tax law includes not only the receipt of direct cash payments, but also "[i]ncome from discharge of indebtedness." I.R.C. 61(a)(12). " '[I]t is settled that the realization of gain need not be in cash derived from the sale of an asset. Gain may occur as a result of exchange of property, payment of the taxpayer's indebtedness, relief from a liability, or other profit realized from the completion of a transaction.' " *Diedrich v. Commissioner,* 457 U.S. 191, 195 n. 3, 102 S.Ct. 2414, 2417 n. 3, 72 L.Ed.2d 777 (1982) (quoting *Helvering v. Bruun,* 309 U.S. 461, 469, 60 S.Ct. 631, 634–35, 84 L.Ed. 864

---

systems for the purpose of developing power supply and interchange agreements.

**12.** Because the court finds that plaintiffs sale of non-firm power to its members, including Buckeye Member, constitutes membership income, plaintiff is entitled to judgment as a matter of fact and law regardless of how the court resolves

the issue of Ohio Power's payments to Cardinal. *See* Plf's Br. filed July 31, 1996, at 5; Tr. at 40 (containing defense counsel's proffer that plaintiff's representation of how each issue effects the three tax years is correct.) The court addresses Ohio Power's payments to Cardinal in the interest of providing a complete record.

(1940)); *see Old Colony Trust v. Commissioner,* 279 U.S. 716, 49 S.Ct. 499, 73 L.Ed. 918 (1929).

Defendant's attempt to attribute Ohio Power's payments to Cardinal as income to plaintiff ignores the fact that plaintiff was not responsible for all of the variable costs incurred by Cardinal. Pursuant to Article Seven of the Cardinal Station Agreement, plaintiff was responsible only for the fuel and maintenance costs attributable to production of the electricity it consumed. Likewise, plaintiff was responsible for those costs attributable to 115% of the capacity of Units 2 and 3 used by plaintiff to meet the peak demand of its members. The Cardinal Station Agreement required Ohio Power to pay the balance of these costs.

▮ Because plaintiff was not obligated to pay for those operating costs allocated to Ohio Power, defendant's argument that Ohio Power's payments to Cardinal relieved plaintiff of indebtedness cannot succeed. The United States Court of Appeals for the Second Circuit has explained that owners and users of property may allocate by contract the ownership and operating costs between themselves. See *Hilldun Corp. v. Commissioner,* 26 T.C.M. (CCH) 1035, 1040 (1967), *aff'd,* 408 F.2d 1117, 1120 (2d Cir.1969). In the case at bar, plaintiff, the owner of Units 2 and 3, and Ohio Power signed a contract, the Cardinal Station Agreement, permitting Ohio Power to use plaintiff's excess capacity. The contract required Ohio Power to pay for the variable costs attributable to its use of plaintiff's excess capacity. Because plaintiff was not obligated to pay the variable costs attributable to Ohio Power, Ohio Power's payment of such costs did not constitute income to plaintiff.[13]

Defendant suggests that the court should view the transaction between plaintiff and Ohio Power as if plaintiff had sold electricity to Ohio Power for one price that equaled the sum of the bank capacity charges and the variable costs. Viewing the transaction in such a light would not change plaintiff's tax-exempt status. In Rev. Rul. 80–86, 1980–1 C.B. 118, the IRS considered whether a elec-

tric cooperative that sold its excess fuel to a non-member could deduct the cost of the fuel from its gross receipts. The IRS ruled that "income" for purposes of I.R.C. 501(c)(12) means gross receipts minus cost of goods sold:

> Thus, for purposes of determining whether 85 percent or more of its income is collected by the organization from members for the sole purpose of meeting losses or expenses, the term "income" means "gross income."

> Gross income is generally considered to represent an intermediate figure between gross receipts and net income. There are two categories of adjustments from gross receipts that must be taken into consideration in arriving at gross income. These are: 1) trade discounts, allowances on goods sold and refunds on returned goods, and 2) cost of goods sold. In the case of an organization selling merchandise, the cost of goods sold generally is the more significant figure in determining gross income.

> While the code does not specifically allow the deduction for cost of goods sold, section 1.61–3(a) of the Income Tax Regulations provides that in a manufacturing, merchandising, or mining business, "gross income" means total sales less cost of goods sold. Similarly, in the case of the sale of merchandise by an organization exempt under section 501(c)(12) of the Code, the cost of goods sold should be subtracted from gross receipts in determining whether 85 percent or more of its income has been collected from members for the sole purpose of meeting losses and expenses.

Rev. Rul. 80–86, 1980–1 C.B. 118.

If the court recharacterized the Cardinal Station transaction as a sale of power by plaintiff to Ohio Power, plaintiff's I.R.C. 501(c)(12) income would equal its gross receipts (the banked capacity charges plus its variable costs) minus its costs. Plaintiff would count as income only the banked capacity charges, exactly what it reported on

---

**13.** The proxies stipulated that Units 2 and 3 are dispatched through the AEP (American Electric Power Co., Inc., parent of Ohio Power) system based upon the needs of AEP's customers.

its Form 990. As a consequence Ohio Power's payments to Cardinal did not constitute income to plaintiff.

## CONCLUSION

Accordingly, based on the foregoing, plaintiffs motion for partial summary judgment is granted, and defendant's cross-motion for partial summary judgment is denied. By July 28, 1997, the parties shall file a Joint Status Report advising of any steps that must be taken before judgment can enter or providing a form of judgment.

**IT IS SO ORDERED.**